406 F.2d 1283
 UNITED STATES of America upon the relation and for the Use of the TENNESSEE VALLEY AUTHORITY, Plaintiff-Appellee,
v.
137 ACRES OF LAND, MORE OR LESS, IN MARION COUNTY, TENNESSEE, Hunley W. Acuff, et ux., Defendants-Appellants.
 No. 18410.
 United States Court of Appeals Sixth Circuit.
 February 21, 1969.
 
 Howard G. Swafford, Jasper, Tenn., for appellants, Raulston & Swafford, Jasper, Tenn., on the brief.
 Thomas A. Pedersen, Asst. Gen. Counsel, Knoxville, Tenn., for appellee, Robert H. Marquis, Gen. Counsel, James H. Eldridge, Tennessee Valley Authority, Knoxville, Tenn., on the brief.
 Before WEICK, Chief Judge, and PHILLIPS and PECK, Circuit Judges.
 WEICK, Chief Judge.
 
 
 1
 This appeal is by the landowner defendants in a condemnation action instituted in the District Court by Tennessee Valley Authority (TVA) in the name of the United States of America. They complain of an award of $34,000, made by the District Court for their 137-acre farm, which award they assert was grossly inadequate.
 
 
 2
 The complaint was filed in the District Court by TVA on August 4, 1966, to condemn the farm for "the construction, operation and maintenance of Nickajack Dam and Reservoir." TVA filed a declaration of taking on the same day and deposited with the Clerk of the Court $34,000, which it had estimated to be just compensation for the property taken.
 
 
 3
 The District Court appointed a Commission, consisting of three members, to ascertain the value of the farm and to assess the compensation to be paid. The Commission heard the evidence and arguments of counsel and filed a report awarding $121,700 to the landowners. One Commissioner, who would have awarded only $34,000 (the exact amount deposited by TVA), filed a minority report. Exceptions to the report were filed by both parties, who entered into a stipulation waiving a hearing by a three-Judge panel and agreeing to submit the case to a single Judge. The District Judge heard the exceptions on the record made before the Commissioners and handed down an opinion which followed the recommendation of the minority Commissioner, and awarded the landowners $34,000. 275 F.Supp. 386 (1967).[1]
 
 
 4
 The farm is located on East Shellmound Road in Marion County, Tennessee, about four miles from Jasper, Tennessee. It has a frontage on East Shellmound Road of around 3,000 feet and extends back to a depth varying from 1,500 to 2,700 feet, and abuts against Little Cedar Mountain. A two-story farm house in a moderate state of repair was located thereon. The farm had been used for raising cattle. A barn located thereon had burned about one month before the taking by TVA.
 
 
 5
 Prior to the taking of the farm by TVA, the State of Tennessee had taken twelve acres off the north end of the farm for a new interstate highway designated as I-24, which would link Chattanooga with Nashville. The new interstate route had been under construction for some time prior to the taking by TVA of the farm. The state highway project had been planned in 1960 and was approved by the Bureau of Roads on August 20, 1960.
 
 
 6
 Originally the plans for the new Route I-24 did not include an interchange at the intersection of East Shellmound Road, which was north of the Tennessee River, but provided instead for an underpass for said road to cross I-24. The state plans did provide for an interchange south of the Tennessee River at the intersection of S. R. 134 and U.S. 41. Subsequently, on September 17, 1964, the state decided upon an additional interchange at the intersection of East Shellmound Road. Thus interchanges were provided on both sides of the Tennessee River. One or more of the ramps for the additional interchange was located on the twelve acres taken from the north end of the farm.
 
 
 7
 The construction of the additional interchange by the state and the connection of I-24 with state routes 2, 28 and U.S. 41 afforded by the interchange, would accommodate a heavy flow of traffic. The interchange provided an exit and property adjacent thereto greatly increased in value as it could be used for business, such as restaurants, motels, gasoline filling stations, and other purposes.
 
 
 8
 The Nickajack Dam and Reservoir project had not been conceived until 1963. The Board of Directors of TVA approved it on February 18, 1963. It was announced publicly on April 5, 1963. Congress did not approve funds for it until December 31, 1963. The additional interchange had been approved by the state two years prior to the date of taking by TVA.
 
 
 9
 The substantial question in this case is whether the increment in the value of the farm occasioned by the construction of the additional interchange by the state should accrue to the benefit of the landowners or the TVA.
 
 
 10
 Four witnesses who testified for the landowners gave values as to ten acres of the farm adjacent to the interchange ranging from $70,000 to $90,000. They placed values on the farm, if enhancement is allowed, ranging from $114,000 to $138,000. Four witnesses who appeared for TVA valued the enhancement from $45,000 to $69,000. Without the enhancement their values of the farm ranged from $31,000 to $34,000; with the enhancement, from $75,000 to $100,000.
 
 
 11
 None of the witnesses, either for the landowners or for the TVA, included in his appraisal any enhancement derived from the construction of Nickajack Dam and Reservoir project.
 
 
 12
 It is the landowners' contention that the enhancement resulting from the construction of the interstate highway project, for which the state had already taken twelve acres of their farm, ought to inure to their benefit rather than to TVA.
 
 
 13
 On the other hand, TVA contends that it was the Nickajack project that brought about the establishment of the interchange, hence the landowners are not entitled to the enhancement in value. It relies on the rule that a landowner is not entitled to the increment in value of the property condemned caused by the improvement made by the condemnor. United States v. Miller, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336 (1943), rehearing denied, 318 U.S. 798, 63 S.Ct. 557, 87 L.Ed. 1162.
 
 
 14
 The trouble with the contention of TVA is that it was not the construction of the Nickajack Dam and Reservoir that enhanced the value of the farm, but rather the interchange constructed by the state for an interstate highway improvement for which it had already taken twelve acres from the farm. None of the enhancement testified to by all of the witnesses was attributable to the construction of the dam and reservoir which was the project of TVA.
 
 
 15
 The Commission made findings which we approve. It found:
 
 
 16
 "The original plans of the Tennessee Highway Department did not include an interchange at I-24 and East Shellmont Road. The plaintiff, Tennessee Valley Authority, through its engineers, recommended that the State construct an interchange at this intersection. A study was made which indicated that it would be desirable to put in an interchange at this intersection. Some of the considerations for the interchange were that an average of 400 to 500 vehicles per day would use this exchange for recreational purposes because of the Dam Project and that an additional volume of 2,532 vehicles would use it in going to and from State Route 2 (U.S. 41) and State Route 28. That State Route 28 would eventually be widened and improved north on up Sequatchie Valley.
 
 
 17
 "The interchange was formally approved and authorized on September 17, 1964, and on November 6, 1964, Tennessee Valley Authority and the State of Tennessee entered into a contract outlining the roads in the vicinity and leading up to the interchange which they each would construct. The interchange was to be, and actually is being, constructed by the State."
 
 It further found:
 
 18
 "In the instant case, while the increase in the on and off traffic at this interchange caused by the construction of the project for which the land was condemned was taken into consideration by the State when it revised the plans to include the interchange, it was not the only consideration. The proof fails to show that without the Dam Project there would have been no interchange here."
 
 
 19
 The state engineer, Sam M. Morrison, testified upon direct examination by TVA counsel, as follows:
 
 
 20
 "Q (By Mr. Eldridge): Now, Mr. Morrison, with regard to this interchange at East Shell Mound Road, without the TVA project Nick-A-Jack Dam, would there have been an interchange there according to the plans?
 
 
 21
 "A According to our planning, prior to the dam the Nick-A-Jack Dam, we did not contemplate putting one there. Now, of course, as the years roll around, well that is something else. I couldn't say just outright that there would not be one there if it wasn't for that." (Italics ours)
 
 
 22
 Four years did "roll around" since original interstate highway plans were made in 1960. It was not until September 17, 1964 that the state decided to change the plans to provide for the additional interchange.
 
 
 23
 Traffic studies by the state estimated that by 1975 2,532 vehicles per day from state routes 2 and 28 would use the interchange, while only 400 to 500 cars would be visiting the dam. In other words, only 15% of the traffic would use the interchange to go to the dam. This does not indicate that the principal purpose of the interchange was to accommodate traffic to the dam.
 
 
 24
 But, as the Commission found, the traffic count was not the only consideration which motivated the state to construct the additional interchange. In a letter dated January 13, 1964, from the State Highway Engineer to the Division Engineer, it was stated that the construction of the interchange would result in a net savings of $2,000,000 of public funds. The Nickajack Dam had created a large reservoir inundating parts of state routes 2 and 28 and U.S. 41. The new I-24 transversed the reservoir just south of routes 2, 28 and U.S. 41. With an interchange at Shellmound Road, traffic from routes 2, 28 and U.S. 41 could enter I-24 to transverse the reservoir, thus relieving the state of the necessary expenditure of funds to raise the inundated sections of routes 2, 28 and U.S. 41 and to maintain the same.
 
 
 25
 The savings to the state inured to the benefit of TVA by reduction of the state's claim against TVA for damages to its highways caused by the inundation from the reservoir.
 
 
 26
 On the basis of these facts, the State Highway Engineer concluded:
 
 
 27
 "Further studies indicate that the cost of raising the present road and bridge through the inundated area would not be economically sound, nor a justifiable expenditure of public funds, mainly due to the fact that the design capacity of the Interstate Route is such that very comfortable and safe accommodation for the total travel for the two routes could be accomplished if an interchange is provided at the Shellmound Road."
 
 
 28
 Furthermore, in the Division Engineer's letter dated September 17, 1964 approving the construction of the interchange, he stated:
 
 
 29
 "The projected traffic that would use this interchange is considerable. * * * [T]he interchange is warranted, even with the present U.S. 41 bridge remaining open for traffic usage."
 
 
 30
 The burden of proof was upon the landowners to establish the value of their farm. United States ex rel. and for Use of TVA v. Powelson, 319 U.S. 266, 63 S.Ct. 1047, 87 L.Ed. 1390 (1943); Welch v. TVA, 108 F.2d 95 (6th Cir. 1939).
 
 
 31
 The burden of proof to establish that Nickajack project brought about the construction of the additional interchange, is on the party which asserted that claim, namely, TVA. In our judgment, TVA did not sustain that burden.
 
 
 32
 The landowners were entitled to the value of their farm on the date of the taking. United States v. Miller, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336 (1943). On that day and for two years prior thereto, the state had approved the interchange which operated to increase the value of the farm.
 
 
 33
 Actually, the farm was not needed for the construction, maintenance or operation of the dam and reservoir, but only to provide an additional means of access thereto. It is qestionable whether the farm was included for acquisition in the original plans of TVA in 1963[2].
 
 
 34
 No part of the farm was to be inundated by the reservoir. As a matter of fact, the farm was separated from the reservoir by Little Cedar Mountain. Nor was any part of the farm below the 640 feet above sea level line, up to which the reservoir was permitted to flood without liability to landowners (Pltff's Ex. 24). The farm was located at least two miles away from the dam.
 
 
 35
 In the contract which the TVA entered into with the state on November 6, 1964, for the purpose of coordinating the work that each was to do in connection with its respective project, the following provision relates to the access highway over the farm, which highway TVA agreed to construct as a secondary highway for the state:
 
 
 36
 "Project 1001. An access highway to Nickajack Dam from the west end of the ramps at the interchange between the east Shellmound Road and Interstate Highway 24 to the dam. A pavement 22 feet wide will be constructed on a roadway having a graded width of 38 feet exclusive of ditches. The length of the project is 2.7 miles."
 
 
 37
 It can be seen readily that it was not necessary to condemn an entire 137-acre farm with a frontage of 3,000 feet and a depth varying from 1,500 to 2,700 feet, in order to provide an access roadway to the dam with a graded width of only 38 feet, exclusive of ditches.
 
 
 38
 It appeared from the evidence, however, that the residue of the farm not needed for the access highway, was actually appropriated by TVA for use as a public park along with its other lands south of the farm. The complaint did not indicate any such purpose for the condemnation.
 
 
 39
 While the landowners may feel that condemnation of their farm for a public park is somewhat remote from the purpose of construction, operation and maintenance of a dam and reservoir it was held by the Supreme Court in United States ex rel. TVA v. Welch, 327 U.S. 546, 66 S.Ct. 715, 90 L.Ed. 843 (1946) that TVA could take land for such a purpose.[3]
 
 
 40
 After acquiring appellants' farm, TVA could, if it so decided, sell the ten acres adjacent to the interchange and use the remaining 127 acres plus its other land for the park. Authority to sell is provided in 16 U.S.C. § 831dd. TVA might find it desirable to sell in order to create an area to provide food, lodging, fuel and other comforts for the betterment and enjoyment of those who visit the dam or those who may reside on lake frontage, which frontage TVA could sell or lease.
 
 
 41
 Thus, on the basis of the award made by the District Court, if TVA is able to sell the ten acres for the lowest appraisal of $70,000, it will not only obtain the access right-of-way and the park for nothing, but it will make a profit of $36,000 by the taking.
 
 
 42
 We do not read the contract dated November 6, 1964, between TVA and the state, as did the dissenting Commissioner, as one to create a joint enterprise between the state and TVA. The state had embarked on its own enterprise long before TVA's was conceived. The purpose of the contract was, as it stated, to provide for —
 
 
 43
 "* * * necessary adjustments of all State's highway facilities and upon the coordination of their [State's and TVA's] construction activities to fix their respective responsibilities and to achieve maximum efficiency in building their respective projects." (Italics ours)
 
 
 44
 The coordination of the separate projects was required in order to accommodate traffic during construction.
 
 
 45
 The District Judge was of the view that the crux of the case was a contractual obligation on the part of the state to construct the additional interchange[4]. He held that because of the contract, the interchange became a part of the TVA Nickajack project. We do not so construe the contract, nor do we attribute to it any such purpose or effect. With equal propriety it could be claimed that the Nickajack Dam and Reservoir were part of the state's interstate highway project.
 
 
 46
 The fact is that the state had decided to construct the interchange two months before the contract was entered into. We would doubt the propriety of the state's engagement to build an interchange merely to accommodate TVA, if other traffic conditions were not present to justify it. TVA traffic accounted for only 15% of the total estimated traffic count. The savings of two million dollars in public funds by the construction of the interchange provided an additional reason for the state to construct it. A factor which undoubtedly influenced TVA to enter into the contract was the provision therein releasing it from all claims for damages to the state occasioned by the inundation of state highways and the cost of their relocation.
 
 
 47
 Upon consideration of all of the evidence, we award the landowners Ninety-Seven Thousand Five Hundred Dollars ($97,500).
 
 
 
 Notes:
 
 
 [1]
 Upon appeal, we consider the case on the record de novo. 16 U.S.C. § 831x
 
 
 [2]
 Louis E. Clark, employed by TVA as a real estate appraiser, testified as to its inclusion, and stated that he appraised the farm in 1963. A TVA Land Acquisition Map (D-9) indicates, however, that on May 19, 1965, Tracts NJR 308 and 309 were added for acquisition. NJR 309 is the farm
 
 
 [3]
 Justices Reed and Frankfurter filed concurring opinions emphasizing that the action of TVA was subject to judicial review. Chief Justice Stone concurred in Justice Reed's opinion
 
 
 [4]
 The contention of TVA as to the contractual obligation was not made during the three-day hearing before the Commission. After the hearing had been concluded, TVA moved to reopen the case so that it might offer in evidence the contract and the case was reopened