The UNITED STATES of America,
Plaintiff,

v.

390.71 ACRES OF LAND, MORE OR LESS, situate IN JACKSON COUNTY, STATE OF ILLINOIS, and Earl O. Boucher, et al., and Unknown Owners, Defendants.

Civ. No. 68–108.

Tract No. 2988.

United States District Court,
E. D. Illinois.

Dec. 12, 1972.

E. Dan Kimmel, Carbondale, Ill., for defendants.

Henry A. Schwarz, U. S. Atty., East St. Louis, Ill., for plaintiff.

## MEMORANDUM AND ORDER

FOREMAN, District Judge:

Defendants, Earl O. and Leona Boucher, properly raise, by petition prior to trial, the issue of the highest and best use of their property on July 29, 1968, the date of taking by the United States. Defendants' land is being taken for the Kinkaid Lake Project which is sponsored by the Kinkaid Creek Conservancy District of Jackson County, Illinois, and which had requested development help from both the State of Illinois and the United States through the Forest Service. The State of Illinois was responsible for building the dam and the reservoir and the United States was to develop for recreational purposes the surrounding and adjacent land, part of which it acquired during the course of this project.

As early as July 10, 1967, the State of Illinois filed several condemnation suits for land to be used in the reservoir prior to the present taking of Defendants' land on July 29, 1968. There appears to be no formal agreement between the State of Illinois and the United States until January, 1970, when the United States authorized the flooding of lands it had acquired, including the lands of Defendants. The dam had not been built and there was no flooding of the reservoir on July 29, 1968, although approximately 85 per cent of Boucher land had to be flooded in order for the lake to be built.

At the evidentiary hearing the Defendants presented Mr. Jack Light, Secretary of the Kinkaid Creek Conservancy District in Jackson County, Illinois, since its formation in 1957 as a development association. Mr. Light testified that talk of development of such Creek went back to the 1930's and that various parties through the years had inquired of both the Federal and State governments to obtain assistance and suggestions in the development of this Creek area. The Kinkaid Creek Conservancy District was not legally formed until 1963. Due to the limited area and land valuation for tax purposes, the District had little money and so turned first to the State of Illinois for help. It was generally agreed that the Kinkaid Lake Project could not have been built without the help of both the State and Federal governments.

Mr. Lindell Roberts from the Regional Office of the Forest Service of the United States Department of Agriculture in Milwaukee and formally of the Forest Service assigned to the Shawnee National Forest Office at Harrisburg, Illinois, testified that he knew the Forest Service was interested in this project as far back as the 1930's. He stated that he personally attended a meeting held in Harrisburg, Illinois, in 1965, also attended by Sam Parr, Director of Conservation of the State of Illinois; Mr. Gillou, Director of the Division of Waterways of the State of Illinois; the Supervisor of the Shawnee National Forest; and by certain other representatives of the Kinkaid Creek Conservancy District and other politicians and interested parties. He testified that a resolution was passed on April 5, 1965, by the Conservancy District asking the Forest Service to "get involved" in this overall project, and that a resolution from the Legislature of the State of Illinois was passed on April 13, 1965, commending this project as worthwhile.

The Forest Service owned approximately 2,000 acres in the area. After its decision to "get involved" in the project, beginning in early 1965, the Forest Service decided to acquire about 51 Tracts, including the Boucher Tract, and to increase its total acreage from 2,000 to 6,000–7,000 acres either adjacent to the lake or in the general area to be used for recreational purposes in conjunction with the lake project.

It was necessary to acquire the Boucher land before the lake could be built due to the fact that approximately 85 per cent of this land was to be flooded by the impoundment of water. In short, the lake could not have been built and the project accomplished without the Boucher Tract. There appears to have been substantial cooperation between the State of Illinois, the Conservancy District and the United States Forest Service in that the Division of Waterways of the State of Illinois submitted the plans for the lake to the Forest Service for its approval, and there was general coordination between the two sovereigns pertaining to planned swimming-beach areas, roadways, and other recreational facilities.

The crucial question here presented is whether or not the Defendants, Boucher, can introduce into evidence at the trial the highest and best use of their property taking into consideration the existence of the lake and dam not yet completed.

■ The fair market value of the land at the time of the taking is to be fixed with due consideration of all the property's available uses, including those which may be reasonably expected in the future. Boom Co. v. Patterson, 98 U.S. 403, 25 L.Ed. 206 (1878). Here it is clear that the Kinkaid Lake project was not physically begun by the time the Federal condemnation proceedings began.

■■ The rule of law which determines whether a condemnee may claim the enhanced value due to the location of a prior condemnation is embodied in United States v. Miller, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336 (1942). If the lands taken were probably within the scope of the original project of which the prior condemnation was a part, from the time the Government was committed to it, then the condemnee is not entitled to enhancement of value attributable to the rest of the project. If the lands taken were not within the scope of the project, then the Government must pay the market value as enhanced by the project. This "scope of the project" rule was held to be one which is for the Court, and not a jury, to decide, United States v. Reynolds, 397 U.S. 14, 90 S.Ct. 803, 25 L.Ed.2d 12 (1969).

Some classic examples of the application of this test are:

United States v. Crance, 341 F.2d 161 (8th Cir., 1965), cert. den. 382 U.S. 815, 86 S.Ct. 36, 15 L.Ed.2d 63 (1965), in which the Government first condemned land for a reservoir. The Government planned to acquire surrounding land for recreational use, although no specific properties were cited in the original written plans. In the subsequent condemnation, the landowners claimed that their property should be valued as recreational property. The Court denied such a valuation, finding that the land was "likely" to become a part of the original project at the time the reservoir condemnation was brought.

In United States v. 2,353.28 Acres, 414 F.2d 965 (5th Cir., 1969), the Government took land adjacent to Defendants' property for use as a rocket site. Then the Government condemned the Defendants' land, whose owners claimed that they were entitled to the enhanced value which the rocket site had given their property. The Court agreed, finding that the Defendants' land had not been likely to be taken when the original rocket-site condemnation was brought.

■■ Thus the cases turn on the issue of whether the second condemnation was part of the same project as the first condemnation. Here, of course, the two condemnations were brought by two different sovereigns. The Court, however, can see no substantial reason for applying any different legal rule to the facts in the instant case. The only reported case involving two sovereigns is United States etc. for the Use of T.V.A. v. 137 Acres, 406 F.2d 1283 (6th Cir., 1969). There the state of Tennessee took land adjacent to Defendants' land for use as an interstate highway. Subsequently the United States condemned Defendants' land for a reservoir. The Defendants claimed that they were entitled to the market value of their land as property adjacent to an interstate highway. De-

spite the existence of a contractual relationship between the state and federal governments, the Sixth Circuit held that the projects were separate and that Defendants were entitled to the full enhanced value of their property. In the instant case, while there was no contractual relationship between the sovereigns at the time of the taking, the facts recited above indicate that the takings were both a part of the same project, which had been planned for some time. This inescapable factual conclusion distinguishes this case from the Sixth Circuit case. The Defendants should not be entitled to claim the enhanced value of their land as recreational property, for the federal-state project never envisioned that their land would be available to them for that use. It was to be taken within the scope of the original project.

For the foregoing reasons it is the ruling of the Court that Defendants shall be prevented at the trial of this action from considering the highest and best use of this property as one which considers the lake in existence at the time of the taking by the United States of America on July 29, 1968.