**Avabelle BASKETT, et al.**

v.

**The UNITED STATES.**

**Nos. 161–78, 340–78, 317–79L, 311–80L and 616–80L.**

United States Claims Court.

May 10, 1985.

Norman E. Hay, Cannelton, Indiana, for plaintiff. Charles S. Gleason, Gleason, Hay & Gleason, of counsel.

Hubert M. Crean, Washington, D.C., with whom was Acting Asst. Atty. Gen., F. Henry Habicht, II, for defendant. Regina R. Belt and James C. Brennan, of counsel.

## OPINION

LYDON, Judge:

In these five consolidated cases,[1] some 95 owners of some 135 tracts of land adjacent to and/or on tributaries of the Ohio River originally sued to recover damages which they allege they have incurred and are continuing to incur as a result of activities relating to the construction and operation of some 7 high-lift dams by the United States Army Corps of Engineers (Corps).[2] The issues presented in plaintiffs' petitions (complaints) are identical to those raised by 23 different owners of land adjacent to the Ohio River in *Loesch v. United States*, 227 Ct.Cl. 34, 645 F.2d 905, *cert. denied*, 454 U.S. 1099, 102 S.Ct. 672, 70 L.Ed.2d 640 (1981).[3] However, the court's ruling on defendant's November 22, 1982, "Motion In Limine", filed pursuant to RUSCC 16, narrowed this litigation to a single issue. *See Baskett v. United States*, 2 Cl.Ct. 356 (1983). That single issue involves the question of whether the construction and the operation of certain high-lift dams on the Ohio River are the cause of erosion on

1. By order dated July 31, 1981, these five cases were consolidated for purposes of further proceedings. At this time all the parties agree that the overall similarity of the cases is such that disposition of these cases in a single opinion is appropriate. The only issue before the court is that of liability. The issue of quantum was reserved for further proceedings, if necessary.

2. The claims of 9 of the original 95 plaintiffs were dismissed at trial with the consent of counsel: Warren Fisher (9) and Clarence Pannett (16) (Docket No. 161–78); Richard E. Blake (3), Jessie E. Bullock, Jr. (5), Harry R. DeVore, Jr. (13), Edwin A. Hart (20), Frances Mathis (29) and Raymond and Loretta Myers (31) (Docket No. 340–78); and G.K. Smarts (20) (Docket No. 317–79L). Donald Allen (1), a plaintiff in Docket No. 317–79L, was deceased at time of trial. Counsel, despite numerous efforts was unable to get the heirs of Donald Allen to enter the litigation by means of substitution. · There was no testimony from the owners of the Donald Allen property. Defendant suggests that under the circumstances the claim of Donald Allen should be dismissed, which suggestion was not opposed. The court accordingly dismisses the claim of Donald Allen. *See Baylor v. United States*, 198 Ct.Cl. 331, 366–69 (1972). Finally, Joel Deckard (2), a plaintiff in Docket No. 311–80L, conceded at trial that his claim was not an erosion claim but was based on another ground. Since his claim had been misdescribed, the court allowed his claim to be separated out from Docket No. 311–80L and set forth as a new and separate case under "Docket No. 311–80L

(Deckard)." As a result of these actions, it would seem that the claims of 84 plaintiffs remain. Husband and wife were treated as one plaintiff. However, because of erroneous ownership designations in said petitions (complaints), ownership of land tracts in different dam pools by the same plaintiff, joint ownership of one tract by more than one plaintiff and other factors, the number of plaintiffs utilized in the narration of the facts will not correlate with the number of plaintiffs set forth in the complaints. This discrepancy, however, is of no significance. The number of land tracts at issue was correspondingly reduced by at least·11 so that approximately 125 tracts remain at issue. Additionally, though these cases initially placed at issue the construction and operation of 7 high-lift dams, the number was reduced to 5 dams at the time of trial.

3. The court notes that, other than the elimination of the issue concerning easements in these cases, the issues in these cases are identical to those presented in *Loesch v. United States*, 227 Ct.Cl. 34, 645 F.2d 905, *cert. denied*, 454 U.S. 1099, 102 S.Ct. 672, 70 L.Ed.2d 640 (1981). Plaintiffs in the two litigations were represented by the same counsel. Plaintiffs advanced essentially identical theories. The only difference between the two litigations is that the plaintiffs in the cases at bar are different, plaintiffs' experts are different, the land tracts are different and two more high-lift dams are at issue in these cases. Defendant's attorney of record and defendant's expert witnesses are the same in these cases as in *Loesch*.

plaintiffs' lands. If so, then such damage caused by the dams in question would, in effect, amount to a taking of plaintiff's land entitling them to just compensation.[4]

These actions were tried by the court during the months of July, August and September 1983. The court has carefully considered the testimony and exhibits introduced in evidence during trial, as well as the post-trial submissions and oral argument of counsel, and issues this opinion setting forth its findings of fact and conclusions of law. For reasons set forth in the following opinion, the court concludes that plaintiffs are not entitled to recover on their claims.

I.

Plaintiffs in these cases are owners of land along both banks of the Ohio River and its tributaries. For a more detailed discussion of the evolution of the Ohio River than is found in this opinion see *Loesch v. United States, supra.* The Ohio River itself is 981 miles long and navigable for its entire length. It has always been well suited as a thoroughfare for the transportation of goods and it has been used as such for decades.

From a geology point of view, the Ohio River is considered an alluvial river in that its soil structure and flow pattern are such that its banks are constantly eroding, the eroded material is transported downstream, and eventually this matter is deposited as sediment. However, there are portions of the Ohio River banks, which are colluvial in nature, *i.e.,* covered with rock and rock debris, or composed of bedrock where the erosive impact of the river is diminished by the more resistant surfaces. However, such resistant banks can create more meander in the river by diverting the currents toward opposite alluvial banks which will erode. The flow of the river will also act to more severely erode the outside of the bends in the river where the flow velocity is greater.

The Ohio River, has for centuries been a very dynamic river. Erosion of its banks caused by the river's own erosive forces has created constant change on the river since its origins. The forces of the river's flow, which varies with the precipitation in its watershed, acts to erode some banks, deposit sediment on others in a healing process, and in some instances has no effect on more stable banks. Erosion on a river of this magnitude with its unregulated flow is not a new phenomenon.

In ascertaining the specific cause of erosion, it is without question that many variables must be studied. Variations in precipitation within the river's watershed will determine both the volume of the river's discharge and the velocity of the flow. It is uncontradicted that during periods of heavy precipitation floods occur. These floods, which increase the velocity of the river flow as well as raise the water level, clearly cause substantial riverbank erosion. Precipitation itself can affect bank conditions and contribute to erosion damage. Land use along the riverbanks including farming, mining, and the building of homes, with their associated increased use of water and the need for drainage, can also cause and/or add to erosion of riverbanks. The existence of certain soil or rock structures either natural or man-made on the riverbanks can either contribute to or hinder erosion damage. Additionally, the construction and operation of artificial structures on rivers, such as dams, can, under some circumstances, alter the river's natural flow pattern, sediment propensities, etc., to the extent that riverbank erosion occurs where it would not have occurred naturally. In any event, it is clear that in order to determine the cause(s) of erosion many factors including climate, soil characteristics at a particular site, river site location, land use and many other mechanisms must be considered.

As stated above, the Ohio River has been historically utilized as a means to transport

---

**4.** The trial record in these cases was voluminous encompassing over 10,000 pages of testimony and over 1300 exhibits. The court heard testimony from 85 witnesses for the plaintiffs and 10 witnesses for defendant.

goods throughout its portion of the midwest. As the boats which travelled the Ohio River increased in size and power and were able to haul more tonage, steps had to be taken to deepen the river channel. The use of a system of locks and dams to increase the depth of the channel began in the late 1800's. The series of locks and dams along the Ohio River has been constantly modernized to: 1) keep up with the increasing size of vessels on the river and 2) to ensure that the increased traffic on the river would move up and down the river as quickly as possible.

This modernization effort included the construction of 49 low-lift dams on the Ohio River. Said construction was completed in 1929. However, as river vessels increased in size and the river traffic increased incredibly the low-lift dams became inadequate and often caused delay. *See Loesch v. United States, supra,* 227 Ct.Cl. at 38, 645 F.2d at 910. In order to alleviate the problems created by the outdated low-lift dams, a modernization program was undertaken in 1954. Under this program 19 high-lift locks and dams were to be constructed to replace the existing low-lift dams on the Ohio River. Said dams were constructed under the authority of the River and Harbor Act of March 3, 1909, 35 Stat. 817. *Id.* 227 Ct.Cl. at 34, 645 F.2d at 911. *See, infra* note 39.

As of the time of trial in this case, 18 of the 19 high-lift dams had been constructed and were operational. The benefit to navigation of these new dams was that they were fewer in number (19 as compared to 49) and they had larger locks thus eliminating the time-consuming and costly lockages necessitated by the greater number of the low-lift dams. Five of these high-lift dams are involved in this litigation. (*See supra* note 2.) These five dams, beginning upstream and working down, are: the Meldahl Locks and Dam, the Markland Locks and Dam, the McAlpine Locks and Dam, the Cannelton Locks and Dam, and the Newburgh Locks and Dam.

Meldahl Dam is located on the Ohio River at river mile 436.2, that is, 436.2 river miles below Pittsburgh, Pennsylvania. Construction on this dam and associated locks began in 1959 and was completed in 1964. The pool was then raised behind the dam until it reached its normal pool elevation of 485 feet mean sea level (m.s.l.) on March 28, 1965. Meldahl Dam and its pool replaced four low-lift dams (Nos. 31, 32, 33 and 34). The pool created by this dam covers 95.2 river miles and ends upstream at the base of the Greenup Locks and Dam. Meldahl Dam was at issue in *Loesch v. United States, supra.*

At the time of trial, 6 plaintiffs owned land adjacent to the Ohio River and/or on its tributaries within the Meldahl pool. The impoundment of the Ohio River by the Meldahl Dam raised the river 9.5 feet above the level of the pool created by old dam number 32. Two of the six plaintiffs with property located on the Meldahl pool were within the 9.5 foot rise area (Charles Leedy and Hobert Rayburn). The Meldahl pool raised the water level 24 feet above the old water level created by old dam 34. The property of one plaintiff on the Meldahl pool incurred this 24-foot rise (Harry Cline, Sr.). Three plaintiffs had properties which were previously adjacent to the pool created by old dam 35 (David Allen, Harry Cline, Jr., and Elmer Lee Jones). The Meldahl pool raised the water level in this area 29.6 feet. The court notes that at the upstream end of the Meldahl pool in the area of the pool created by old dam 31, the pool rise was only 2 feet. The Meldahl dam is operated to maintain a 9-foot channel. Flowage easements, made necessary by this project, were obtained by the Corps by purchase or condemnation from riparian landowners during the period 1961–1963.[5]

**5.** "These flowage easements, in general, gave the United States Army, Corps of Engineers (the Corps) the perpetual right to permanently and/or occasionally overflow, flood and submerge riparian fast lands, *i.e.,* lands above the ordinary high water mark (OHWM), above-stated elevations. These flowage easements also gave the Corps the continuing right to clear and remove, below stated elevations, timber, brush, debris and natural obstructions which in the opinion of the Corps may be detrimental to the

Markland Dam is located on the Ohio River at river mile 531.5. It is 95.3 miles downstream from the Meldahl Dam. Construction of this dam commenced in 1956 and the pool elevation behind the dam reached its normal pool level of 455 feet m.s.l. in January 1963. Markland Dam replaced 5 low-lift dams (Nos. 35, 36, 37, 38 and 39). Markland Dam was not at issue in *Loesch v. United States, supra.*

At time of trial, 12 plaintiffs owned land adjacent to the Ohio River and/or on its tributaries within the Meldahl pool. After the pool level reached 455 feet m.s.l. (its normal level), it had in fact decreased the pool by four-tenths of a foot in the area of the old pool created by former dam 35. Two of the 12 plaintiffs in the Meldahl pool region were in this area in which there was actually a pool reduction (Charles E. Keller and Arthur Kruger). Two of the 12 plaintiffs own property where the old pool created by Dam 36 was located (Henry Rudd and George Nienaber). In this area there was a 6-foot pool level increase. One plaintiff owned property where the pool created by old dam 37 used to be located (City of Covington). There was a 13.9 foot rise in the water level created by the impoundment of water by the Meldahl dam in this area. Six of the 12 plaintiffs with property on the Meldahl pool experienced a pool level increase of 29 feet at the location of their land (River Ridge Park, Inc., John Rolsen, Boone County, Kentucky, John Crowe, Louis Hemer, and Thurman Owens). Such an increase in the pool level occurred in the area of the pool of old dam 39. The property of plaintiff Richard Chamblee is located on the opposite side of a road from an Ohio River tributary which empties into the Markland pool. Therefore, he has no property fronting the Ohio River or a tributary and his property incurred no pool rise. Markland Dam, like Meldahl and the other high-lift dams, is operated in order to maintain a 9-foot channel. Also, as in the case of the Meldahl pool, the Corps secured easements, attendant to the Markland project, either by purchase or condemnation from the riparian owners where it was found necessary to acquire them. (*See supra* note 5.)

The McAlpine Dam is located at river mile 604.4 near Louisville, Kentucky. The McAlpine Dam and associated locks were built on the same site as old dam 41. It is essentially a modernization of that old dam and lock system. Construction of the McAlpine Dam and Locks project began in 1958 and was completed in 1965. The installation of the McAlpine Dam did not alter the normal pool level previously maintained by old dam 41. The normal water level over the approximately 75-mile long pool has been 420 feet m.s.l. since 1927 when the pool was raised to that level behind old Dam 41. The McAlpine pool ends upstream at the base of the Markland Dam previously discussed. McAlpine Dam was not at issue in *Loesch v. United States, supra.*

At time of trial, seven plaintiffs owned tracts of land adjacent to the McAlpine pool on the Ohio River: Malcolm Carraco, John & Phillip Campbell, Taylor Properties, Inc., John Taylor, Sr., John Taylor, Jr., Bruce Lorch, and George Egger. Due to the fact that the McAlpine Dam merely replaced a previous dam which maintained the identical pool level none of properties owned by these seven plaintiffs incurred an increase in water level on its banks. Additionally, the absence of a pool level rise made acquisition of new flowage easements unnecessary.

Cannelton Dam is located at river mile 720.8 on the Ohio River which places it 3 miles upstream from Cannelton, Indiana. Construction on this project began in 1962 and was completed in 1974. The normal pool elevation of 383 feet m.s.l. was permanently reached on August 17, 1972. The pool created by the Cannelton dam is the largest of all the high-lift dam pools covering approximately 114 miles. The pool terminates below the McAlpine Dam near Louisville, Kentucky. The installation of the Cannelton Dam and Locks replaced completely three low-lift dams (nos. 43, 44

dam projects." [*Loesch v. United States,* 227    Ct.Cl. 34, 40 n. 6, 645 F.2d 905, 911 n. 6 (1981).]

and 45), as well as replacing a portion of the pool created by old dam 46. Cannelton Dam was at issue in *Loesch v. United States, supra.*

At time of trial, 54 plaintiffs owned property adjacent to the Ohio River and/or on its tributaries in the area of the Cannelton pool. When the Cannelton pool reached its full normal level of 383 feet m.s.l. it did not increase the water level in the area of the pool of old dam 43. This area with no pool level increase comprises about 20 percent of the total Cannelton pool area. Therefore, the 8 plaintiffs, who own property in the area formerly covered by the pool of old dam 43, which is the upstream area of the Cannelton pool, experienced no pool level increase (the heirs of Howard B. Marrs, Dr. Ben A. Reid, Gilbert and Helen Moore,[6] Harold Cunningham, Ed and Lillian Knear, Mackey and Mary Jane Knear, City of West Point, Kentucky, and Benjamin and Helen Perchik). Fifteen of the plaintiffs with property on the Cannelton pool, or on tributaries which empty into it, experienced a pool elevation of 9 feet (Chester Klinstiver, C.H. Withers, Avabelle Baskett, Nettie King, Gilbert Cannon, Earl Barks, Roy Sonner, Carl Marshall, William Gerdon, Carl Stauth, Walter Hollis, N.A. Popham, Dorothy Cole, Hazel Edgerton, and John Bell). The property of said plaintiffs was located in the area where the pool of old dam 44 was previously located. In the stretch of the Ohio River where the pool of old dam 45 used to exist, the Cannelton Dam raised the water level by 16 feet. Twenty-three plaintiffs own property adjacent to the Ohio River and/or on its tributaries in this area in which the 16-foot pool rise occurred (Bayward Cole, Earl Mangin, Wallace Mangin, Charlotte Simonson, N.A. Popham, William Schrader, James Cole, Margarette Heron, Edith Haynes, Lorena Richardson, Ora Shacklette, Dorothy Stephenson Krutz, Mary Buechter, Marvin Bruington, Edward Goss,

the Pike Heirs, Michael Popham, Clara Elder, Gary Johnson, David Alexander, Emmett Terry, Herman Williams, and Harold Hagman, Sr.). Eight plaintiffs own property on the portion of the Cannelton pool where the impoundment of old dam 46 used to be (Hendry Acres, Inc., Harold Hagman, Jr., Francis Hagman, Alvin Shearn, Rayburn McGee, Elmer Cooper, Southern Indiana Rural Electric Coop, Inc., and Charles Lutgring). The banks of these properties experienced a pool level elevation of 25 feet.

The Cannelton Dam was constructed with the capacity to provide for a 12-foot channel. However, the record indicates that, at all times material herein, the dam has been operated to maintain a 9-foot channel with a normal pool level of 383 feet m.s.l. Flowage easements necessitated by the Cannelton dam project were obtained by the Corps by purchase or condemnation from the riparian landowners whose property required such an easement during the period 1964–1967.

Newburgh Dam was constructed on the Ohio River at river mile 776.1 which is approximately 2 miles upstream from Newburgh, Indiana. The Newburgh Locks and Dam project replaced two low-lift dams (nos. 46 and 47). Construction on this project began in 1965 and was completed and dedicated on October 25, 1975. The normal pool level of 358 feet m.s.l. was achieved in January of 1975. The Newburgh pool is 55.4 miles long and ends upstream at the base of the Cannelton Dam. Newburgh Dam is the farthest downstream project involved in this litigation. The Newburgh Dam was at issue in *Loesch v. United States, supra.*

At the time of trial, there were three plaintiffs with property located adjacent to the Ohio River on the Newburgh Dam pool (Southern Indiana Rural Electric Coop., Inc., Joseph Nelson, and Martin Winkler).

6. On February 19, 1985, the court approved plaintiff's motion to substitute the heirs of Howard B. Marrs for Howard B. Marrs (15) who initially filed his petition (Docket No. 161–78) on April 14, 1978. Howard B. Marrs died before trial thus necessitating the substitution. On October 16, 1984, plaintiff Dr. Ben A. Reid, Sr. was substituted for plaintiffs Gilbert and Helen Moore, Dr. Reid having purchased the land tract in issue.

All three of the properties owned by these plaintiffs were located in the area where the pool of old dam 46 used to lie. When the impoundment behind the Newburgh pool reached its normal level of 358 feet m.s.l. it did not increase the pool elevation formerly established by old dam 46. Therefore, none of the properties of these three plaintiffs incurred a pool rise and it was unnecessary for the Corps to acquire flowage easements from them in order to construct the Newburgh Dam.

The network of high-lift dams was installed solely as a navigational aid. The purpose of these dams is to maintain a minimum channel depth (9 feet) which allows the large tow boats and their barges to utilize the river, even in periods of low natural flow. These high-lift dams were not designed to function as flood control devices by storing excess flow like a reservoir. *Loesch v. United States, supra,* 227 Ct.Cl. at 41, 645 F.2d at 912. In fact, there are no flood control dams on the Ohio River itself though there are several such dams on the tributaries of the Ohio River.

In simplified terms, the high-lift dams maintain a consistent channel depth by increasing or decreasing the openings of their gates when necessary. For example, during periods of low flow in the river the gates are closed or opened very little to increase the water level, but as the flow of the Ohio River increases the gates are opened to the extent necessary to maintain a consistent channel depth. During flood conditions when the natural river flow is at its maximum, the gates of the high-lift dams are fully opened. At that point the dams exert little or no influence on the river which is essentially allowed to flow in its natural state.[7] The record clearly indicates that it was the exceptional year in which two or more high-flow periods did not occur. *See also Loesch v. United States, supra,* 227 Ct.Cl. at 41–42, 645 F.2d at 912.

Once the high flows or floods subsided the high-lift dam gates would be manipulated so that they exerted control over the river to maintain a consistent channel depth. As was discussed earlier, the five high-lift dams at issue here raised the normal pool level in some areas above the old levels established by the low-lift dams. With such a new higher normal pool level, there was less of a fluctuation from flood stage level to normal pool when the high flows receded. This factor can serve to reduce the erosive effects of receding wa-

**7.** The flow rates necessary to require the complete opening of the high-lift dam gates varies between the different dams at issue in this case due to the variations of the total square foot area of the gates of the different dams. Therefore, when the flow is 364,000 cubic feet per second (cfs), the Meldahl gates are completely open. The other flows which warrant the complete opening of the gates of the various dams are as follows: Markland Dam, 415,000 cfs; McAlpine Dam, 227,000 cfs; Cannelton Dam, 328,000 cfs; Newburgh Dam 200,000 cfs.

The fact that it requires various flow rates to warrant completely opening the gates of the different dams explains why specific dams will be operating to maintain their normal pool while others will have their gates completely open. For example when the flow in the river is at 227,000 cubic feet per second the McAlpine Dam gates are at a position set for open river conditions. However, at the same time the Markland and Cannelton Dams on the upstream and downstream ends of the McAlpine pool, respectively, will be continuing to function to maintain their normal pool during a flow rate of 227,000 cfs.

The court concludes that these necessary variations in the operation of the gates of the different dams also explains why there were often more fluctuations in the pool level at the upper end of certain dam pools. These fluctuations were caused by the need to open the gates of the upstream dam, *e.g.,* McAlpine, while the downstream dam, *i.e.,* Cannelton Dam was continuing to maintain a constant pool level. Therefore, as the upstream dam released more water the pool level would increase in the downstream pool area until it became necessary for the downstream dam to adjust to the increased flow. However, the court is persuaded by the record in this case that such fluctuations in pool level at the upstream ends of the various pools did not cause the erosion at issue.

Related to these upper pool variations, plaintiffs' experts presented testimony on "back-water curves." This testimony was less than clear. After reviewing said testimony in the context of the record as a whole the court is not persuaded that the back-water curves utilized by plaintiffs demonstrated any cause and effect relationship between operation of the high-lift dams and the erosion damage on plaintiffs' riverbanks.

ter levels, called "drawdown." (*See infra* note 32.) The court also notes that during low and normal flow stages the high-lift dams actually acted to reduce the velocity of the river flow. Such an impact of the high-lift dams can also serve to reduce erosion caused by the natural erosive forces of river velocity. *See Loesch v. United States, supra,* 227 Ct.Cl. at 42, 645 F.2d at 912–13.

The Court of Claims, in *Loesch v. United States, supra,* concluded that "the construction and operation of high-lift dams do not cause floods, or increase the number of floods, or affect flood peaks and time intervals, or increase the effect of flood events." *Id.* 227 Ct.Cl. at 42, 645 F.2d at 913. After a review of the record in this case, the court finds that plaintiff introduced no new evidence to contradict this finding which was supported by an extensive study by the University of Cincinnati which found no correlation between the installation of the high-lift dams and the frequency of floods.[8]

## II.

■ There can be no question that the Federal government has the authority to improve navigable waters in the interest of navigation. *See United States v. Kansas City Ins. Co.* 339 U.S. 799, 804, 70 S.Ct. 885, 888, 94 L.Ed. 1277 (1950); *United States v. Chandler-Dunbar Water Power Co.,* 229 U.S. 53, 62–63, 33 S.Ct. 667, 671–72, 57 L.Ed. 1063 (1913). However, it is also settled law that in making improvements on navigable waters if damage results to privately-owned land above the ordinary high-water mark (OHWM)[9] the

government is then liable, on the theory of a fifth amendment taking. *See United States v. Kansas City Ins. Co., supra,* 339 U.S. at 805–06, 808 n. 7, 70 S.Ct. at 888–89, 890 n. 7, *United States v. Cress,* 243 U.S. 316, 320–21, 326–29, 37 S.Ct. 380, 382, 384–85, 61 L.Ed.2d 746 (1917); *Goose Creek Hunting Club, Inc. v. United States,* 207 Ct.Cl. 323, 331, 518 F.2d 579, 583 (1975). *See also Barnes v. United States,* 210 Ct.Cl. 467, 474–76, 538 F.2d 865, 870–71 (1976).

■ If governmental action raises the level of navigable waters, not only must it pay for the area above the OHWM which it floods, but it also must pay for any erosion or washing away of land above the new water level which is directly or proximately caused by the governmental act. *See United States v. Dickinson,* 331 U.S. 745, 750, 67 S.Ct. 1382, 1385, 91 L.Ed. 1789 (1947); *Stockton v. United States,* 214 Ct.Cl. 506, 513–15 (1977). However, absent the requisite showing that governmental action was the proximate and direct cause of the erosion damage, the government cannot be held liable for a fifth amendment taking. *See Rhoads v. United States,* 6 Cl.Ct. 278, 279 (1984); *Loesch v. United States, supra,* 227 Ct.Cl. at 43, 645 F.2d at 913; *Coates v. United States,* 124 Ct.Cl. 806, 811–813, 110 F.Supp. 471, 474–75 (1953); *Yazel v. United States,* 118 Ct.Cl. 59, 71–72, 93 F.Supp. 1000, 1003. *See also Sanguinetti v. United States,* 264 U.S. 146, 149–50, 44 S.Ct. 264, 265, 68 L.Ed. 608 (1924).

## A.

The issue of the cause of the erosion complained of in this case is not legal, it is

---

**8.** The court notes that many of its findings in this case are similar or identical to those made in *Loesch v. United States, supra.* The similarity between the findings should not be considered unusual considering the fact that the same stretch of river, three of the same dams, and properties with similar riverbank compositions are at issue in these cases. The record in these cases indicates that neither the dams nor the river have changed appreciably since the *Loesch* decision.

**9.** The ordinary high-water mark (OHWM) is the point which marks the limit of the navigable

stream bed. *See United States v. Kansas City Ins. Co.,* 339 U.S. 799, 805, 70 S.Ct. 885, 888, 94 L.Ed.2d 1277 (1950). The United States Supreme Court stated in pertinent part in *United States v. Willow Creek Power Co.,* 324 U.S. 499, 509, 65 S.Ct. 761, 767, 89 L.Ed. 1101 (1945): "High water mark bounds the bed of the river. Lands above it are fast lands and to flood them is a taking for which compensation must be paid. * * * Lands below that level are subject always to a dominant servitude in the interests of navigation and its exercise calls for no compensation."

factual. *Loesch v. United States, supra,* 227 Ct.Cl. at 43, 645 F.2d at 913. *See also Rhoads v. United States, supra,* 6 Cl.Ct. at 280. The issue properly phrased is whether the construction and/or operation of the Ohio River high-lift dams relevant to this case were the direct and proximate cause of the erosion which has and is taking place on some of the plaintiffs' properties either adjacent to the Ohio River and/or on its tributaries.

Plaintiffs contend that when the high-lift dams increased the elevation of the normal water level in the vicinity of their riverbank properties the erosion of their banks drastically increased from the top to the bottom of said banks. Plaintiffs maintain that the higher water levels permitted wind and vessel generated waves to attack their banks at higher levels than was the case when the low-lift dams were in place.[10] In this regard, the court notes that the water level was not raised by the high-lift dams in the vicinity of the lands of about 20 plaintiffs in this action, but yet there was and is erosion occurring on their properties.

Plaintiffs' primary contention is that wave action is the mechanism or cause of all of the erosion on their properties. Plaintiffs also imply that the increase in water elevation itself aides and exasperates the erosion caused by waves. Plaintiffs argue that the increased pool levels acted to soften the banks making them more susceptible to wave erosion. The record indicates, to the contrary, that an increase in the elevation of a pool to a new essentially constant level provides pressure on the face of the bank and actually more stability. In any event, the burden of proof in this case to show that the alleged wave action is the direct and proximate cause of the erosion damage complained of rests on the plaintiffs and not on the defendant. In other words, plaintiffs must establish that a taking has indeed occurred which warrants the award of just compensation under

the fifth amendment. *See Loesch v. United States, supra,* 227 Ct.Cl. at 44, 645 F.2d at 914 and cases cited therein.

During the trial in these consolidated cases, many of the plaintiff landowners testified. From their testimony it was clear that erosion, in varying degrees, was occurring on most of their riverbanks. Defendant admits that on most of the properties in issue erosion to a greater or lesser extent is occurring. However, "proof of damage alone does not necessarily prove a taking." *Yazel v. United States, supra,* 118 Ct.Cl. at 72, 93 F.Supp. at 1003. Every one of the plaintiffs who chose to give an opinion as to the causation of the erosion at issue stated or implied that erosion on their riverbanks was not a problem until after the high-lift dams were installed and the pool levels were raised. It followed, in their reasoning, that the high-lift dams must be the cause of the erosion.

This type of reasoning in arriving at a causative effect is referred to as *post hoc ergo propter hoc* (after this therefore on account of this). Such reasoning was rejected as unpersuasive in *Loesch v. United States, supra,* 227 Ct.Cl. at 45, 645 F.2d at 914. *See also Rhoads v. United States, supra,* 6 Cl.Ct. at 280; *Yazel v. United States, supra,* 118 Ct.Cl. at 70–73, 93 F.Supp. at 1002–04. The court in *Loesch* found that the plaintiffs were basically not attentive to their riverbanks prior to the construction of the high-lift dams and it was not until after the installation of the dams that they began to anticipate erosion. In these cases, the plaintiffs sought to demonstrate that they were indeed attentive to their riverbanks, in an effort to counter the court's finding in *Loesch.* Accepting their testimony at face value does not prove much, for as stated in *Volentine and Littleton v. United States,* 144 Ct.Cl. 723, 726. 169 F.Supp. 263–65 (1959): *"Post hoc ergo propter hoc* is neither good logic

---

**10.** Plaintiffs' claim for damages must be restricted to the land above the flowage easements taken, if any were indeed taken on their land. Their claim for damages must be from the new OHWM (the upper limit of the flowage easements taken) and up. *See Loesch v. United States, supra,* 227 Ct.Cl. at 43–44 n. 7, 645 F.2d at 913–14 n. 7.

nor good law." [11] The facts in *Loesch v. United States, supra,* 227 Ct.Cl. at 45 n. 8, 645 F.2d at 914 n. 8, and the facts in the cases at bar demonstrated that erosion had been occurring on the litigants' riverbanks for decades prior to the construction of the high-lift dams. The court in these cases finds such a generalized *post hoc ergo propter hoc* approach to establishing the cause of erosion most unpersuasive.

In addition to utilizing a generalized *post hoc ergo propter hoc* approach to ascertain the cause of erosion on their riverbanks, many of the plaintiffs offered other opinions as to causation as well. Many of the plaintiffs who gave another opinion concluded that the combination of waves generated by winds and tow boats and the raising of the water level, which: (1) provided more water to soften the banks and make them susceptible to wave erosion and (2) allowed the waves to strike the banks at higher elevations, caused all of the erosion on their banks.[12] They were of the view that absent the pool level increases the erosion damage their banks have incurred would not have occurred.

Plaintiffs rendered other causation opinions as well. Some felt the cutting of the trees by the Corps in the easement area killed the trees which resulted in less stability for the banks. Others felt that the constant fluctuation in the pool levels as indicated by the hydrographs caused instability in their banks. They concluded that such pool level fluctuations were caused by the Corps' manipulation of the high-lift dams. Other plaintiffs cited heavy rains and flooding in the winter and spring as major contributing factors to erosion damage on their banks.[13] Clearly, heavy rains are not caused by the high-lift dams, and the court has previously concluded that said dams affect neither the magnitude nor frequency of flooding.

In general the court found most of the plaintiffs who testified to be quite credible, God-fearing, honest individuals. The court concurs with the view of one of defendant's experts who found the landowners to be good observers (Tr. 9091). However, erosion is a complex phenomenon, especially in determining its cause. Often there can be many mechanisms at work producing erosion either individually or in concert with

---

**11.** The court recognizes that not all of the plaintiffs who testified relied solely on this type of generalized reasoning and the court will address their other opinions on causation *infra.* However, almost all of the plaintiffs implied such reasoning in their testimony and most used it as the basis for their ultimate conclusion that the high-lift dams were the cause of the erosion damage to their riverbanks. In these cases the court is of the view that plaintiffs' attentiveness to the banks not only increased dramatically after the installation of the high-lift dams, but in some cases such attention increased due to the publicity surrounding the *Loesch v. United States* litigation in and about the Ohio River regions.

**12.** When some of the plaintiffs referred to waves striking their riverbanks at higher elevations it was apparent to the court that they were referring to the large storm-generated waves which strike the banks during flood conditions. The damage created by such waves was illustrated graphically by the movies of winter storms presented by defendant's experts. Such waves are caused by storms and flood conditions and the damage which results therefrom is not proximately caused by the high-lift dams.

**13.** In addition to the damage caused by the velocity force of floods, some plaintiffs cited the detrimental effect to their banks caused by the quick recession of flood stage waters back to the normal pool stage. This receding of flood waters down the banks to normal pool level is referred to as "drawdown" which will be discussed *infra* in note 32. As the plaintiffs accurately observed drawdown can have a substantial impact on the stability of banks but it is in no way related to the installation and/or activity of the high-lift dams. In fact, if anything, the high-lift dams restricted the impact of the drawdown mechanism. This restriction was brought about by the fact that the high-lift dams raised the normal pool levels so that after a flood the drop down to normal level is less severe and thus the impact is correspondingly less significant.

Some plaintiffs also cited the damage done to their property by barges striking their banks or coming in too close to their riverbanks. The fact that the raising of the pools may have allowed the barges to navigate closer to the shore does not mean that the damage, caused by barges striking the banks or passing too close, was directly and proximately caused by the high-lift dams.

one another which adds to the complexity of erosion activities. Ascertaining the cause of such a complex natural occurrence requires the analysis of many variables and cannot be reduced to simple answers. Therefore, this is a case in which the testimony of experts is particularly appropriate, given the fact that the court has been presented with evidence of a highly technical nature involving geotechnical, hydrologic, hydraulic, geological and climatic matters. *Loesch v. United States, supra,* 227 Ct.Cl. at 45, 645 F.2d at 914. *See also Gisriel v. Uniroyal, Inc.,* 517 F.2d 699, 702 (8th Cir.1975).

Further support for the court's attributing more weight to the testimony and opinions of experts than to the opinions of the landowners in this case to determine the cause of the complex phenomenon of erosion can be found in the testimony of Wickliffe B. Hendry (Hendry) who testified on behalf of Hendry Acres, Inc., (Docket No. 317–79L(8)) a corporation which owns land adjacent to the Ohio River. At the time of trial Hendry was a licensed engineer with a Masters of Science Degree in mechanical engineering. Other than speculating by utilizing a general *post hoc ergo propter hoc* type approach, Hendry denied that he knew what mechanism was causing erosion along the Ohio River (Tr. 952). Other than speculating that wave action may be a potential cause, Hendry expressed a preference "to leave the technicality of the mechanism to the experts." (Tr. 955). The court finds that the preference of Mr. Hendry, an expert in his own right, to leave this causation issue primarily to the experts is the proper approach to adopt in these cases.

Given the fact that the sole issue before the court is what caused the erosion along the Ohio River and its tributaries and the court's conclusion that the determination of said cause is one that requires the aid of experts, the court has carefully scrutinized the testimony of the experts presented by both parties.

The first of two primary experts [14] presented by plaintiffs was Eric D. Loucks (Loucks). At the time Loucks testified he

---

**14.** Dr. Henry H. Gray (Gray) was an additional expert called by plaintiffs. Gray had a Master's degree and a Ph.D., presumably in geology. He considered himself a stratigrapher which is a geologist who principally studies layered sedimentary rock. Gray was called by plaintiffs to testify as to his knowledge concerning stability problems on Highways 66 and 166 in the area of the Cannelton pool.

Gray had been requested by the Indiana State Highway Department to determine whether bedrock movements at specific locations along Highways 66 and 166 were causing the deterioration of the roads. After examining the sites in 1968, prior to the raising of the Cannelton pool, Gray determined that bedrock movement was not occurring. He kept no written records of his observations. Other than determining that bedrock movement was not the cause of the road problems, he admitted that he did not try to determine the principal cause of the landslides (Tr. 5187). However, plaintiffs apparently called Gray to give an expert opinion on the actual cause of the road deterioration in the areas he observed.

Gray labeled the area he examined a classic slide debris area. He stated that landslides were occurring in 1968 and the 1983 landslide he observed at the same site was recurring movement of the earlier slides (Tr. 5163). Though Gray denied attempting to assign a principal cause to the landslides, he did intimate that perhaps the raising of the water level in the Cannelton pool, which raised the water on the riverbanks at the highway sites, removed a portion of the toe of the slope (base of the slope which serves as the foundation for a bank in slide areas) and allowed the slides to occur.

The court finds Gray's toe of the slope opinion or theory unpersuasive. First, he admitted he did not attempt to arrive at a principle cause and was only asked by the Highway Department to examine bedrock movement. Second, he admitted that the amount of moisture in a landslide area is crucial to determining the propensity to slide but he did not examine climate data at the time of the slides to ascertain rainfall amounts. Third, the issue in this case is whether the high-lift dams caused the damage complained of. Gray testified that the highway area in issue had historically been a landslide area. There were landslides in that area in 1968 which was before the dam pool was elevated. This shows a lack of correlation between the Cannelton pool level rise and the landslides cited. Finally, though the court found Gray to be a credible and articulate witness, it found his testimony to be very generalized and hypothetical. Several of the opinions he gave were based solely on his experience without any data to support his theories. The court attributes very little weight to such theories or opinions.

was 25 years of age. Loucks had his Bachelors of Science (B.S.) degree in civil engineering but had not yet completed his masters degree in said area of study. Based upon taking specific courses while studying for his B.S. in civil engineering, Loucks was offered as an expert hydrologist. Loucks taught some hydrology courses at the University of Wisconsin at Madison, Wisconsin.

During his testimony Loucks recited a great deal of data concerning the increase in the width of the Ohio River based on comparisons of 1911–1914 river maps and more recent post-high-lift dam river maps. Loucks implied that the total increases in the width of the Ohio River were attributable to the construction of the dams in question. However, it became apparent to the court that Loucks' width comparisons were flawed in that the 1911–1914 width data was based on low river flow whereas the more recent data was not. Therefore, though it is clear that the high-lift dams did increase the width of the Ohio River, the court views Loucks' testimony concerning the degree that the dams increased the width of the river and the inferences that may be drawn from such an increase as having little value to the court due to his flawed analysis. The court notes that "opinion evidence is only as good as the facts upon which it is based." *Loesch v. United States, supra,* 227 Ct.Cl. at 46, 645 F.2d at 915.

Loucks also testified at length as to the fluctuations in the levels of the various river pools impounded by the high-lift dams. Loucks read into evidence many river gauge readings from the various pools as printed in the "Ohio River Bulletin." For the most part Loucks attributed such fluctuations in pool levels to manipulations, or a lack thereof, of the high-lift dam gates by the Corps. Loucks implied that the fluctuations experienced in the late 1970's had not been experienced over previous time spans.

The court does not question the gauge readings or the fact that the pool levels may have fluctuated to a degree. However, Loucks admitted that he never went behind these gauge readings to perhaps determine why they were occurring. Loucks, relying on one set of weather data, also discounted the impact that weather conditions may have had on the pool level variances. The court is convinced that the 1970's was indeed a period of excessively wet weather in the Ohio River region. The court concludes that any complete study of pool fluctuations should have taken these wet conditions into consideration.

Finally, as stated above, the issue in this case is causation. Loucks certainly documented that pool level fluctuations occurred. He also testified that he observed in movies, which were part of the record in these cases, evidence of terracing or benching along the lower banks in the upper sections of the river pools. However, he did not give an opinion as to what was causing said terracing and if he implied such an opinion, he later denied that he had given such an opinion. Indeed, his testimony indicates he did not know what caused the terracing on the lower banks (Tr. 6400–01).

Generally, the court found Loucks to be able, intelligent and competent, but lacking in experience and depth of research relative to the matter at issue in these cases. His lack of familiarity with the river itself and his failure to actually observe the river and the individual properties involved caused the court to discount the value of his testimony. It was clear that Loucks relied totally upon movies, photographs, mechanical measurements, and calculations made by others. This reliance upon the observations of others, and the failure of Loucks to directly address the issue of causation warrants the attribution of very little weight to his testimony.

The second expert presented by plaintiffs was Garth A. Fuquay (Fuquay). Fuquay, age 66 at the time of trial, received a bachelor's degree in civil engineering in 1940 and subsequently received a master's degree in soil mechanics and foundations in 1948. Fuquay's work experience included almost 30 years of service in the Corps

from which he retired in 1978. His experience in the Corps and a brief stint with a private engineering firm included participation in projects all over the world. He worked on airfields, railroads and various types of dams. Fuquay spent at least 9 years working for the Pittsburgh District of the Corps where he primarily worked on flood control dams on the Ohio River tributaries, but he did participate, at least in part, in the design and construction of the Hannibal high-lift dam. The court acknowledges Fuquay's expertise in the general area of soil mechanics.

During Fuquay's work stint with the Pittsburgh District of the Corps he became aware of bank erosion occurring behind dams constructed by the Corps on the Monongahela, Allegheny and Ohio Rivers. Fuquay decided to study the Maxwell pool on the Monongahela, to develop a theory on the cause of the bank erosion. The theory he developed was set out in a 1972 report, Fuquay prepared, entitled *"Bank Erosion on Lower Velocity Streams."* This report was submitted by Fuquay to the International Commission On Irrigation and Drainage at a Conference in Verna, Bulgaria in 1972. Fuquay submitted this report as an individual and not as a representative of the Corps of Engineers. It is clear to the court that Fuquay relied almost entirely upon this report and his subsequent Ohio River observations to arrive at his opinion on what caused the erosion in these cases.[15]

Basically, Fuquay theorized that on streams or rivers with a bank velocity of 1 meter (3 feet) per second, if you raise the pool and no wave action occurs, there will be no erosion. However, if the pool is raised, the banks become saturated with

water and waves either generated by boats or wind strike the banks and cause them to breakdown. Fuquay theorized that the waves form benches or terraces at the base of the banks. These benches are made up of the soil material from the banks which the waves cause to erode off. As these benches form, the remaining banks behind the benches become steeper.

Fuquay initially developed this theory in 1972. When he was asked by plaintiffs' counsel to testify in these cases he stated that he would not do so until he determined if his theory was indeed accurate. To ascertain the accuracy of his theory for application to the cases at bar, he examined the pool on the Ohio River behind the Hannibal high-lift dam. None of the plaintiffs' properties at issue in this case is one the Hannibal pool. The Hannibal dam is located hundreds of miles upstream from the closest high-lift dam at issue in this case. After examining the Hannibal pool, Fuquay felt that his observations made therein, for the most part supported his theory and he agreed to testify. Other than reviewing his 1972 report and observing the Hannibal pool, the only other basis of his opinions given during trial was 2 days of observations on a portion of the McAlpine and Cannelton pools made while on board a boat cruising these two pools.

The court found Fuquay to be an intelligent, able, competent and well-spoken witness. However, the court finds that Fuquay's theory had an insufficient factual foundation for application to the properties at issue in these cases. *See Loesch v. United States, supra,* 227 Ct.Cl. at 46, 645 F.2d at 915; *State of Washington v. Unit-*

---

**15.** One of the formats for reports submitted at this conference was the critique of each submitted report by a panel of experts. The court notes that several individuals submitted comments to Fuquay's report after it was published. These comments focused on the damage to banks caused by flooding. In rebutting these comments, Fuquay noted that his theory was only applicable to streams with flow velocities of 1 meter per second. Fuquay also admitted that flood water above the ordinary high-water mark can cause enormous damage much of which is not associated with erosion. He, how-

ever, further distinguished his report by limiting it to rivers with ordinary high-water marks which coincide with the top of the riverbank and with water levels which follow a generally predictable pattern. These comments and rebuttals point out: (1) that Fuquay's theory is not unanimously embraced by all, and (2) that the limitations placed on his theory make it very specific requiring a great deal of analysis of a section of river to ascertain whether or not the characteristics of that section of river allow an accurate application of his theory.

*ed States*, 214 F.2d 33, 43 (9th Cir.1954), *cert. denied*, 348 U.S. 862, 75 S.Ct. 86, 99 L.Ed. 679. In developing his theory, it appears to the court that Fuquay did not analyze all of the potential causes for erosion and eliminate each one systematically until he arrived at the causative mechanism which he presented in this case. Instead, it appears that Fuquay based his theory simply upon his observations along the bank at the Maxwell pool without looking any further. Therefore, the court questions the accuracy of Fuquay's theory as applied to the properties in issue in these cases based on his failure to fully study the individual properties in issue and the potential causes for the erosion occurring thereon.[16]

Another factor which precludes the court from attributing great weight to Fuquay's testimony is his failure to analyze the particular properties of the plaintiffs in this case to ascertain the cause(s) of the erosion taking place thereon. Fuquay spent 2 days on a boat in only the McAlpine and Cannelton pools, simply observing the banks. He did not actually set foot on any of plaintiff's properties.[17] Fuquay did not analyze the river flow velocities in the relevant areas to determine whether or not they exceeded the 1 meter per second velocity limitation he placed on the applicability of his erosion theory. Fuquay admitted that stream velocity is a major cause of bank erosion but he offered no evidence of the velocity along the relevant properties. He also admitted that if the flow velocity exceeds 1 meter per second then his theory does not apply. He admitted that some of the properties in the Cannelton pool did not exhibit benching but were still eroding which weighs against his theory. There are also some areas in the pools at issue which did not incur pool elevation increases which seem to be necessary under his theo-

**16.** In addition to failing to completely study other potential causes, there were other important factors Fuquay discounted or ignored in applying his theory and arriving at his conclusion. He examined no meteorological data concerning periods of heavy precipitation. He also did not consult any hydrological data which would include bank drainage information. In the specific areas where he developed his theory he discounted the fact that: (1) there existed a stream flowing parallel to the river just behind the riverbank he utilized for test purposes; (2) there were tons of coal refuse on top of the riverbank in his study area; (3) dredging had occurred in the study area just prior to his examination of it which may have caused part of the bank to fall into the river; and (4) flooding had occurred shortly before he made his observations. The court considers all of these factors and data critical to developing an accurate theory on the causation of erosion.

In cross-examining one of plaintiffs' experts, Gray (*see supra* note 14), defendant's counsel asked Gray about the concept of a "multiple working hypothesis" (Tr. 5185–87). Gray conceded that a multiple working hypothesis is a standard for rendering a professional opinion. Essentially under the multiple working hypothesis an expert hypothesizes concerning possible causes for a given phenomenon. Then the expert collects an assortment of data. Based on said data the expert then rules out the least possible and arrives at the most possible or probable cause. Absent such an analysis, Gray conceded that an expert opinion would not meet the standards of his profession (Tr. 5186). The court is of the view that Fuquay's proffered opinion fails to meet the multiple working hypothesis standard.

**17.** In an effort to minimize the fact that Fuquay did not visit and analyze the properties of the individual plaintiffs, plaintiffs' counsel consistently argued, and still does, that water has similar properties anywhere in the world and that soil is soil anywhere in the world. The court assumes that plaintiffs' counsel also relies on these general assertions to support his use of and to add weight to erosion reports from other rivers and bodies of water which were relied on by plaintiffs at trial.

Despite the fact that soil in one part of the world may be similar to soil in another part of the world, how the soil is situated within the topography and how it is layered, along with a myriad of other factors on a particular site, including the general climate, will play a role in how soil will react to outside pressures. An old adage advises that each tract of land is unique.

Generalizations concerning the similarities of soil and water do not account for the various and complex causes of erosion which may be acting in a given location. The variables which can exist in two different areas warrant in these types of cases that specific site analysis be performed in order to completely substantiate expert opinions and conclusions. Therefore, the fact that soils and water may be similar in different locations does not serve to replace the necessity in cases such as these for individual site inspections if significant weight is to be given to the opinions and reports placed in evidence.

ry. Fuquay also did not review defendant's exhibits or the reports of defendant's experts either in an effort to refute defendant's erosion theories or in an effort to support his own theory.[18] For the most part, Fuquay relied on his own report and limited observations of the properties in issue while ignoring available and relevant scientific and other data for the pertinent time period and property locations.

Additionally, some of Fuquay's testimony did not support plaintiffs' broad erosion causation position. The issue in these cases is what caused the erosion damage suffered by plaintiffs on their riparian banks. Plaintiffs maintain that all such erosion is caused by the high-lift dams. The issue tried in these cases does not revolve around the propriety of the ordinary high-water mark (OHWM) as established by the Corps.[19] However, Fuquay expressed the opinion, on the basis of his theory of erosion, that the OHWM should have been established higher up on the banks than it was to take into account pool level fluctuation and wave action. Fuquay testified that any damage above the *proper* OHWM is caused by flooding and is not defendant's responsibility, *i.e.,* was not the result of the construction and operation of the high-lift dams. He stated that some of the erosion complained of high on the riverbanks may have been caused by floods, especially in the winter and spring (Tr. 7026). Plaintiffs, on the other hand, broadly contended that all of the erosion that has occurred on their riverbanks was caused by the high-lift dams and they did not, at trial, question the propriety of the OHWM directly. Therefore, Fuquay's testimony does not support plaintiffs' broad erosion claim position.

In addition to conceding that some of the bank erosion suffered by plaintiffs was caused by flood damage and not by the high-lift dams, Fuquay's testimony also weakened plaintiffs' erosion claims generally. Fuquay admitted some of the erosion complained of could have been caused by ground water seeping into the river from plaintiff's property, a causative factor cited by defendant's experts. He testified that a soils engineer would be required to ascertain which properties were so affected and which were not. Neither Fuquay, himself, nor plaintiffs made any effort in this area to ascertain the cause of erosion on the individual properties. Fuquay offered a general theory which he then admitted may not account for all the erosion of which plaintiffs complained. This further reduces the weight to be attributed to his causation opinion.

Finally, other statements made by Fuquay during his testimony do not support plaintiffs' positions. First, it is evident that a portion of plaintiffs' theory of erosion causation encompassed the theory that when the Corps cut down many trees along the Ohio River banks the result was the elimination of a vital source of riverbank stability and internal support. Fuquay testified that the roots of cut trees will continue to hold a bank thus negating the position taken by some of the plaintiffs. Second, Fuquay commented on a report transmitted to the United States House of Representatives from the Secretary of War in 1935. The report was prepared by the Corps concerning the advisability of dams on the Ohio River. That report stated that erosion had always existed along the lower Ohio River and that the riverbanks in that region were less stable. Fuquay stated that the lower Ohio River includes the dam

**18.** The court notes that plaintiffs have the burden of proving by a preponderance of the evidence that the relevant high-lift dams are in fact the direct and proximate cause of the erosion damage on their riverbanks. *See Loesch v. United States, supra,* 227 Ct.Cl. at 53, 645 F.2d at 920. It was not encumbent upon defendant to prove that another cause(s) exists for the erosion taking place.

**19.** Though such an issue was not raised by any of the plaintiffs during trial and it was apparent to the court during trial that the focus of plaintiffs' case was not the propriety of the OHWM, plaintiffs in their post-trial brief raised the issue ostensibly for the first time. Based on the fact that their primary expert witness expressed such an opinion, plaintiffs were essentially required to raise the OHWM issue. The court will address the issue in detail, *infra.*

pools at issue in this case. That report provides evidence that erosion along the relevant portions of the Ohio River is not a new phenomenon.

The court notes that its position in attributing little weight to the testimony offered by Fuquay is corroborated by an order issued by the Court of Claims in *Loesch v. United States,* 227 Ct.Cl. 63 (1981). After the trial judge had rendered his decision in *Loesch v. United States, supra,* 227 Ct.Cl. at 34, 645 F.2d at 905, the plaintiffs, who were landowners along the Ohio River in approximately the same location as some of the plaintiffs in this case and who were represented by the same counsel, moved the appellate panel of the Court of Claims to reopen proof and remand the case to the trial judge so that Fuquay's report, *"Bank Erosion on Lower Velocity Streams"*, mentioned earlier, could be considered. *Loesch v. United States, supra,* 227 Ct.Cl. at 63. The Court of Claims denied this motion finding that: (1) the report was not an official report of the Corps, and (2) the report was irrelevant.

The Court of Claims found the report irrelevant based on the fact that it was limited to streams with a bank velocity of 3 feet per second whereas the portion of the Ohio River in question often exceeded that velocity. *Id.* 227 Ct.Cl. at 63. This court has found no evidence which would indicate that the flow velocity of the river has changed since the *Loesch* decision was rendered. To the contrary, defendant established quite convincingly that during high-flow periods (floods) the river's flow velocity often exceeds 3 feet per second at which time most of the destruction takes place. Therefore, based on this court's finding that Fuquay's opinion was primarily premised on his 1972 report, and the Court of Claims ruling, cited above, that said report was irrelevant in almost a factually identical case, the court finds the

holding in *Loesch v. United States, supra,* 227 Ct.Cl. at 63 supportive of its determination to attribute little weight to Fuquay's erosion causation opinion.

The approach taken by plaintiffs' primary expert, Fuquay, was generalized and certainly lacking in the specific research and analysis deemed necessary to determine whether his theory was applicable to the particular riverbank sites at issue in these cases. Defendant, on the other hand, engaged several experts who, with the aid of Corps personnel, conducted detailed and exhaustive studies on each of plaintiffs' properties. Defendant's experts considered many possible mechanisms which could potentially cause the erosion complained of, and arrived at the specific cause on each litigant's riverbank(s). The thoroughness of the studies performed and the scientific nature of their methodology, and analysis, gave defendant's experts a strong factual basis for their ultimate conclusions. Defendant's research team, which included personnel of various specialties, possessed a professionalism which gave the court a sense of reliability, fairness and a sincere interest in ascertaining the actual cause(s) of erosion on each plaintiff's tract of land. The court concludes that the studies and resulting data and ultimate conclusions drawn therefrom by defendant's experts are entitled to great weight in determining the cause of the erosion damage in these cases. The ultimate conclusion of all of defendant's experts was that the erosion taking place on plaintiffs' riverbanks along the Ohio River was not caused by or related to the construction and operation of the high-lift dams in issue.

In the presentation of its case defendant utilized a number of expert witnesses. The chief consulting experts relied upon by defendant were Dr. Stanley A. Schumm (Schumm), Dr. Daryl B. Simons (Simons) and Dr. D. Joseph Hagerty (Hagerty).[20]

**20.** Defendant presented several other expert witnesses in these cases. The experts not listed above primarily testified concerning various tests they conducted or data they collected and interpreted which were used to support the testimony of Schumm, Simons and Hagerty. The court finds that all of defendant's experts were qualified to conduct their respective studies and to render opinions regarding the results of the various studies.

Schumm obtained a Ph.D in geomorphology from Columbia University in 1955 and at the time of trial he was a professor of geology at Colorado State University. Based on Schumm's qualifications, as stipulated to by plaintiffs, and his prior experience of studying the Ohio River for the *Loesch v. United States, supra,* case the court found Schumm to be eminently qualified to offer opinions concerning the evolution and classification of the Ohio River and the phenomenon of erosion along the Ohio River.

In preparation for his testimony in these cases Schumm visited the riverbank sites of all plaintiffs who continue to maintain claims relating to the issue of erosion.[21] After visiting these sites and observing the potential causes of erosion at each site, Schumm submitted a report concerning erosion in the relevant areas of the Ohio River. Said 1982 report utilized the same general background material as the 1977 report Schumm submitted in *Loesch v. United States, supra,* but he updated the report to encompass his observations concerning the specific sites at issue in these cases. His report took into consideration many possible causes of the erosion damage on plaintiffs' properties.

In general, Schumm classified the Ohio River as a meandering river, *i.e.,* a river with a sediment composition which is such that the river channel will change position over time with a constantly fluctuating path. As a meandering river, Schumm testified that the Ohio River has always had erosion along its banks. A great deal of this erosion occurs on the outside of bends in the river where the flow velocities tend to be greatest. It was Schumm's opinion that the meandering character of the Ohio River was not altered by the installation of the high-lift dams. This geomorphologic history of the Ohio River indicates to the court that erosion is not a relatively new phenomenon on the Ohio River, but has occurred since the river's inception. The old photographs of extensive erosion along the Ohio River banks presented to the court by Schumm and other witnesses further support, the court's conclusion that erosion has taken place on the Ohio River for centuries.

Schumm analyzed several potential causes at each location of the plaintiffs' properties. Schumm rejected the theory that the erosion complained of was caused by raising the pool levels of the river after the installation of the dams. Schumm correctly pointed out that erosion is occurring on several sites at which no pool raise took place.[22] Therefore, he felt a generalized theory that the erosion complained of was caused by increasing the level of the pools must be rejected.

Schumm did find that rain water flowing over the surface of a bank can cause some erosion. He also testified that ice flows on the river in the winter can cause damage to the banks. Schumm also cited the erosive forces of the flow of the river itself as wearing on the bank and causing erosion especially on the sites located on the outside bend of the river.[23] Based on his observations on the different properties, Schumm discounted the impact that wave action had on the banks. Schumm, relying

The court notes that Schumm, Simons and Hagerty were all expert witnesses for defendant in *Loesch v. United States, supra,* 227 Ct.Cl. at 49–53, 645 F.2d at 917–19 where their qualifications were fully set forth. The court finds that all three possess the necessary qualifications to serve as expert witness in these cases.

21. The only site that Schumm did not visit was the property owned by Joel Deckard on the Uniontown Dam pool. *See, supra,* note 2.

22. There are at least 20 plaintiffs who own riparian property which incurred no pool raise after the installation of the high-lift dams. Sites which encountered no pool raise can be found

on the Markland, McAlpine, Cannelton and Newburgh pools. Despite the lack of a pool raise almost all 20 of the sites suffered substantial erosion damage.

23. Schumm cited 22 sites owned by plaintiffs in this case which are located on the outside or near the approach of a bend where the maximum erosive forces of the river occur. Schumm pointed out that even if the forces are not sufficient to erode the bank, they are sufficient to transport away debris created by other erosive forces.

on his geomorphic background, determined what a bank eroded by waves would look like and observed that he found no such structures on the sites he visited and studied.

Schumm observed that most of the erosion on the plaintiffs' properties was occurring high up on the banks. He determined by observing the different sites, that this erosion occurring well above the normal pool levels was attributable to two primary causes. The first and primary cause he cited was internal erosion or what he referred to as "subsurface flow of the seepage or piping mechanisms." (Tr. 7777). The court learned from several of defendant's experts that internal erosion occurs when water from on top of the bank supplied by rainfall, ponds, runoff from adjacent hills, springs, septic tanks, and/or poor drainage infiltrates the ground and flows through the more previous seams of soil toward the river. As this flowing water exits the bank it carries with it a portion of the permeable soils. Gradually that seam of permeable soil, generally sand, is removed by these subsurface flows and the materials on top of the sand seams at the bank face slough off.

The second major cause of the erosion on the upper banks cited by Schumm is flooding. The higher velocity flows experienced during flooding cause the upper banks to erode, and these increased flows also wash away the eroded debris created by internal erosion, discussed above. There is another effect of flood waters cited by Schumm. He stated that during a high-water period the banks are saturated with water and when the pool level returns to normal the water in the bank seeps out at a slower rate than the pool level recedes causing internal erosion which renders the banks unstable. Schumm attributed most of the erosion complained of in this case to damage caused by floods and internal erosion, referred to as piping or seepage.

Finally, Schumm stated that 12 of the sites he observed exhibited landslide activity. Such sites have stable lower banks with unstable features at the top. The stability at the bottom of the slopes was attributed to what Schumm referred to as natural rip-rap created by the existing rock and soil structure at that level. The landslides that were occurring on these properties were in no way attributable to the raising of the pool levels or any other function of the river or the navigation system placed on it.

The court found Schumm to be a credible witness, clearly familiar with the region of the Ohio River in question. His efforts in considering many possible causes for the erosion experienced on the sites in question, as opposed to developing a single theory of causation, in the court's opinion, more accurately reflect the scientific approach which should have been followed in this case as compared to the approach utilized by plaintiffs' experts. (*See supra*, note 16.) Additionally, the fact that Schumm visited all of the plaintiffs' properties and made observations concerning the potential causes of erosion at each property adds further credence to his testimony.

Simons, the second of defendant's three primary experts, had a Ph.D. in civil engineering and his experience was concentrated in the study of river mechanics, including erosion and bank stability problems. Like Schumm, Simons demonstrated thorough preparation for his testimony. He had visited every site still at issue at the time of trial. His analysis included consideration of all possible causes of erosion instead of focusing on one or two as plaintiffs' experts did. Overall, the court found Simons to be a knowledgeable, experienced witness whose familiarity with the dynamics of the Ohio River and its impact on plaintiffs' riverbanks made his testimony quite persuasive.

Simons concluded that over 90 percent of the erosion complained of along the Ohio River was caused by major floods. Floods are caused by the increased discharge of water which is caused by increased precipitation in the river's watershed area. Simons cited climatic data which indicated that the decade of the 1970's was an exceptionally wet period for the Ohio River re-

gion. This greater amount of precipitation increased the discharge of water which in turn increased the velocity of the river flow as it approached flood stages. At flood levels, Simons noted, the velocity of the river is around 8 feet per second which far exceeds the 3 feet per second limitation set on the applicability of Fuquay's wave theory.

Simons testified that the high-lift dams are manipulated in such a manner that as the discharge increases into the river the gates of the dams are raised so that the increased volume can flow through in a somewhat natural manner. As the flood waters increase, the gates are eventually totally lifted out of the water and the river is flowing naturally.[24] At flood stage the force of the river velocity is such that it causes substantial erosion to the banks especially on the outside of river bends.

In addition to the effects of flooding, Simons, like Schumm, also cited seepage forces flowing through the riverbanks as another cause of erosion in the Ohio River banks. The excessively wet conditions of the 1970's added more water to the land just above the banks. The water would infiltrate into the bank and seep through to the river. Simons also cited how increased land use can also add more water to the ground which can subsequently flow through the pervious layers of soil and increase internal erosion problems.

Simons pointed out that the existence of the high-lift dams actually reduced the problem of erosion caused by seepage. He pointed out that in the natural river, or the river without its high-lift dams, floods would go up to the same level on the banks as flood levels achieved since the installation of the high-lift dams. At those flood levels the banks would become partially saturated with water. As the floods subsided the stored-up water would seep out causing instability in the bank. Simons explained that without the high-lift dams the natural level to which the river returned after a flood was often much lower than the pool level that the river returns to with the high-lift dams in place. This greater variation in pool levels would allow the seepage forces to act over a more expansive area of the bank causing more erosion damage.

Simons also analyzed the impact of waves on the banks of the Ohio River. He admitted that at low velocities waves acting in concert with other erosive forces will cause some damage. However, it was his opinion that as compared to other erosive forces, i.e., floods, river flow and internal erosion, the impact of waves alone is insignificant. Simons stated that wave action worked with other forces to cause damage which would have occurred anyway, absent the wave element, because of the other forces at work. In contrast to Simons'

24. Plaintiffs alleged that the opening of the gates to regulate flow often caused sudden bursts of water which created high velocity flows for a period of time in the downstream pool. Such high velocity flows, plaintiffs claim, caused erosion on their property. Simons explained that the dam gates are operated to minimize such sudden rushes of water. He also testified that stilling basins with flow dampeners were installed immediately downstream of the dams to reduce the energy levels of the water that is released. The court is persuaded that the released water does come out at higher velocities at times, but that its energy is reduced to a point that the potential erosion caused thereby is minimal when compared to the erosion caused by floods and other mechanisms.

The court also notes that the installation by the Corps of some flood control dams on the upstream tributaries helped to hold back a portion of the increased discharge in high precipita-

tion periods. Therefore, the Corps' efforts have, in part, served to reduce the impact of floods on the Ohio River banks as opposed to augmenting the problem. The court, as indicated previously, is persuaded that, based on the entire record, the operation of the high-lift dams does not cause an increase in the frequency or magnitude of flooding on the Ohio River.

Furthermore, the court notes that its predecessor court was faced with a similar argument in *Loesch v. United States, supra.* The Court of Claims concluded that the high-lift dams on the Ohio River "do not increase the frequency, duration or peaks of floods on the Ohio River * *." *Id.* 227 Ct.Cl. at 53, 645 F.2d at 919. Considering the fact that three of the high-lift dams at issue in *Loesch* are again at issue in these cases, this conclusion by the Court of Claims further supports the view that the high-lift dams do not cause or increase flooding.

approach and conclusions, plaintiff relied on a generalized theory the wave action caused erosion on all the sites involved. The court is persuaded, especially after hearing the testimony of defendant's experts who have visited all the sites, that plaintiffs' approach in this case was insufficient to meet its requisite burden of proof.

Finally, Simons, like Schumm, pointed out that ice flows in the river can cause damage to the banks. He also found that some of the sites were experiencing landslides. Such landslides may have become more frequent caused in part by the wet climate of the 1970's. However, Simons also pointed out that the elevated pool levels created by the high-lift dams helped reduce the frequency of landslides to a certain extent because the water pressure higher up on the banks gave the banks a constant source of stability.

The court found Simons' testimony quite persuasive. His thorough preparation and consideration of all potential causes, like Schumm's methodology, seems to conform more closely to the type of scientific analysis that experts generally rely on than the analysis utilized by plaintiffs' experts. (*See supra* note 16.) If, as stated earlier, an opinion is only as good as the facts which support it, then the testimony of all defendant's experts is entitled to great weight.

The final primary expert presented by defendant was Hagerty. Hagerty received his Ph.D. in civil engineering in 1969. At the time of trial he was a professor of civil engineering at the University of Louisville. He had also written seven books and almost 60 journal articles. Hagerty's experience with the Ohio River and its high-lift dams is, to say the least, extensive. From 1971 when he began environmental impact studies on the Cannelton Dam until the time of trial, Hagerty studied the high-lift dams on the Ohio River constantly.

Hagerty was the principal leader of the erosion research team for the defendant in *Loesch v. United States, supra.* As such, he studied at length several of the dam pools involved in this case. His previous experience in this region, combined with his painstaking study efforts in preparation for this trial make him eminently well-qualified to express an opinion concerning the cause of erosion on each and every tract of land at issue in this case. Hagerty's methodical analysis of each site, which generally included at least three visits [25] to each tract as well as the supervision of extensive data collection on each site, provided a substantial degree of credibility and persuasiveness to his testimony.

Hagerty commenced his testimony by providing his general observations concerning all the sites that he visited. He first expressed his opinion that 99 percent of the erosion which occurs on the Ohio River results from storms and floods. This testimony was dramatically and persuasively illustrated by movies taken from stationary cameras set up by Hagerty on the banks of the Ohio River. These films showed large chunks of riverbanks falling off as the result of extremely high-water levels, high-flow velocities and huge waves generated during winter storms.

In addition to the erosion caused by the high velocities of the river during floods and waves coinciding with flood waters generated during winter storms, Hagerty emphasized that during floods the water level becomes excessively high on the face of the banks. The water from the river infiltrates the bank and when the flood recedes, the water stored up in the bank seeps out causing internal erosion. This seepage leads to the slumping of soils which no longer have the support of the seams of material which are eroded away. This piping or seepage form of erosion was found by Hagerty to exist on the property of every litigant that exhibited erosion

**25.** On a very small number of the sites Hagerty made only two visits. However, on many sites he was there four or more times. In addition to these visits, Hagerty took an extensive reconnaissance trip down the entire length of the Ohio River in 1978. During said trip Hagerty took thousands of photographs of the riverbanks and recorded his observations made primarily from a boat.

damage not attributed totally to landslide phenomena. Hagerty found that springs, ponds, standing rain water and septic tank runoffs as well as other sources were all substantial contributors to internal erosion which he found to be the major cause of erosion on the upper banks in addition to the flood mechanism.

Hagerty greatly discounted the impact of waves on the shore. Hagerty cited an extensive study which concluded that wind waves have a more significant impact than waves generated by tow boats and that both types of waves were an insignificant cause when compared to natural water velocities. Hagerty's own observations corroborated the conclusions of that report. Hagerty observed on almost every site at issue that, at most, the waves acted only on the erosion debris which had fallen from the higher bank to the foot of the bank after internal erosion caused a collapse. He found that the waves seldom had a major impact on this loose debris and that, in fact, flood flows generally acted to rework and remove the fallen material. In addition, he pointed out that substantial erosion often occurred far above the normal pool level where waves generated by wind or tow boats could not possibly reach. In fact, Hagerty observed that the banks often exhibited a stable mid-section with substantial vegetation while erosion was occurring primarily above the stable point. Given these facts, plaintiffs' theory that the erosion in all instances is caused by wave action appears to be implausible.[26]

Plaintiffs also asserted that the pool level increases also contributed to the erosion complained of in this case. Hagerty addressed this contention by stating that if such a theory were accurate then the erosion would be more extensive in the high-lift dam pools which had been in existence the longest. However, he found no such correlation in comparing the age of the various dam pools and the extent of erosion taking place on each one.

In similar correlation studies Hagerty determined that two other theories advanced by plaintiffs were not accurate. First, plaintiffs asserted that fluctuations in the upstream portion of the dam pools[27] caused substantial erosion. However, in a study supervised by Hagerty it was found that there was no more erosion in the up-

26. Plaintiffs' expert, Fuquay, claimed that the condition of the islands in the Ohio River supported his wave theory. Fuquay hypothesized that if the erosion was not caused by waves generated by wind and river traffic, then both the side of the island encountering the heavy traffic and the side away from such congestion would experience the same extent of erosion damage. On the islands Fuquay observed he found significant erosion only on the traffic side.

Hagerty, on the other hand, studied several islands in the dam pools at issue in this case and found significant erosion on both sides caused by internal erosion of seepage and piping and the force of the river flows. After reviewing both experts' observations concerning island erosion, the court finds Hagerty's opinions more persuasive based on the extensive studies that he did on 18 Mile Island including visiting the island weekly for 1 year, and the fact that Hagerty studied several islands which were in the relevant dam pools in this case whereas Fuquay studied islands only in upstream pools not in issue in these cases.

27. Defendant presented David Beatty (Beatty), a supervisory hydrologist engineer with the Army Corps of Engineers with 22 years' experience, to, in part, explain the fluctuations in pool level experienced at the upper end of the dam pools. Beatty explained that during the wetter than normal 1970's discharge increased significantly in the Ohio River basin. This increased discharge would fluctuate with the amount of precipitation for a given time period. As discharge increased, depending on the gate area of each high-lift dam, the dams would react at different discharge levels, to compensate for any increased flow. As a result an upstream dam may have been releasing water at a slightly greater rate than the down-river dam thus causing a momentary pool level rise. However, Beatty cited a study done (Tr. 8481–83) which determined that such upper-pool fluctuations in water level did not increase appreciably after the construction of the high-lift dams as compared to those fluctuation experienced when only the low-lift dams were operating. Since all the plaintiffs maintained that erosion along the Ohio River was at most insignificant prior to the installation of the high-lift dams and the study cited by Beatty finds similar pool fluctuations at the time of both the high and low-lift dams then it is difficult to perceive how such fluctuations can be the cause of the erosion taking place on the properties at issue.

per end of the pools than in the lower end. Second, plaintiffs claimed that as the volume of river traffic increased so did the erosion damage on the riverbanks. However, in another study directed by Hagerty no correlation was found between traffic volume and the extent of erosion on a particular dam pool.[28]

In specifically addressing Fuquay's wave theory, Hagerty observed the study sites, along the Monongahela River and on Ohio River dam pools not at issue in this case, utilized by Fuquay to develop his theory. He basically found Fuquay's study sites to be unrepresentative of some of the relevant areas along the Ohio River.[29] In addition to finding Fuquay's study areas unrepresentative, Hagerty rejected Fuquay's empirical theory, *i.e.,* a theory based primarily upon observing a phenomenon. Basically, Hagerty found that the benches Fuquay observed (even at his own study sites) were caused by internal erosion or seepage damage. The material making up Fuquay's benches consisted of soil which had slumped from the upper banks and subsequently was reworked by flood flows and in part by waves.

The aspect of Hagerty's testimony which made it strongly persuasive to the court was the extensive nature of the studies performed. Hagerty's general theories regarding the cause of erosion on plaintiffs' properties were supported by direct observations of each site, extensive soil sampling, thousands of photographs and countless scientific tests.[30] After gathering this data and analyzing it, Hagerty was able to classify each litigants property depending on the degree of erosion occurring there, if any.[31]

Defendant and its experts have at no time disputed that substantially all of the properties at issue in this case are suffering from some form of erosion or soil failure. Hagerty's classifications reflect this concession. Of the approximate 125 sites remaining in this case Hagerty classified approximately 14 of the sites as stable. Most, if not all, of these sites are on tributaries of the Ohio River as opposed to the main stem. He classified 16 sites as either landslide areas or properties with banks which are protected by an artificial condition such as rip-rapping. There were several properties which were in part classified as being landslide areas or as areas covered with artificial conditions not included in this number. The remaining sites were classified as suffering from erosion either substantially or to a lesser degree according to Hagerty's classification system. (*See supra* note 31.)

In his testimony, Hagerty went through each and every piece of property at issue conveying his observations, the results of the analysis of the data collected, and finally giving his conclusion as to the cause of erosion at each site. With the exceptions of the stable sites, experiencing little or no

---

**28.** Hagerty also rejects, at least in part, plaintiffs' claim that the Corps' cutting of the trees on the bank contributed greatly to the erosion problem. Hagerty explained that trees provide some stability to banks, but they cannot stop erosion. Trees, he testified, merely slow down erosion slightly. Therefore, he concluded that the cutting of the trees is not an actual cause of erosion.

**29.** Hagerty found at one primary Monongahela study site huge coal refuse piles from a mining operation sitting on the riverbank in Fuquay's study area which placed an incredible weight load on the bank. He found streams flowing toward the riverbank as well as abandoned sewers and mines behind the bank that Fuquay had not considered. Hagerty discovered that a flood had occurred in the study area just prior to Fuquay's observations which had caused substantial damage. At one of Fuquay's sites dredging had occurred prior to his study which had altered the character of the riverbanks.

**30.** For example, on each site where erosion was alleged to have occurred, at least one and often several trenches were dug to analyze the soils and to search for evidence of piping or seepage.

**31.** Hagerty classified the different properties with numbers one through five. One through three indicated unstable banks: one indicating substantial erosion and three indicating erosion to a lesser degree. A classification of four indicated a stable bank. A classification of five indicated an area suffering from hillside creep or landslides. A classification of five also indicated an artificial condition on the bank, *i.e.,* rip-rap.

erosion, and the sites with artificial protection or possessing landslide conditions not attributable to the river's activities, Hagerty ultimately concluded that the erosion complained of is being caused by seepage and piping which causes the upper bank to slump off.[32] The erosion debris created by such slumping is reworked and often removed by periodic flood flows on the river. He found no evidence of significant wave damage and pointed out that the erosion complained of is both vertically and horizontally distant from the normal pool level where waves would act. More importantly, Hagerty did not attribute any of the erosion complained of in this case to the installation and operation of the high-lift dams. With this ultimate opinion, defendant's other expert witnesses concur.

It must be emphasized that the extensive study performed by Hagerty and the engineers and technicians who assisted him was of such a nature that it warrants this court giving great weight to Hagerty's testimony. The court is in no way deferring to his or any other expert opinion, it is merely attributing a degree of weight to Hagerty's opinion as the court must do with each expert and lay opinion given.

There is a great deal of conflict and dispute in the record on the erosion issue among the witnesses who testified in this case, lay and expert. As might be expected, there were two sides to the issue. Defendant's experts presented a solid front that held that the high-lift dams were not responsible for the erosion taking place on plaintiffs' properties. However, plaintiff's expert, Fuquay, who was the only primary expert for plaintiffs to advance an ultimate opinion on causation, admitted that the erosion damage occurring on the upper portions of the banks was caused by mechanisms outside the control of defendant. Having concluded that the construction and operation of the high-lift dams did not cause any of the erosion damage complained of, defendant's experts would certainly agree with this portion of Fuquay's testimony. Based on the entire record, the court concludes that damage to the higher banks was caused by internal erosion and floods. Since the court has concluded that the high-lift dams do not increase the frequency, duration or peaks of floods on the Ohio River, it follows that a great deal of the erosion damage on plaintiffs' riverbanks would have occurred absent the installation of the high-lift dams. *See United States v. Sponenbarger*, 308 U.S. 256, 266, 60 S.Ct. 225, 229, 84 L.Ed. 230 (1939); *Loesch v. United States, supra*, 227 Ct.Cl. at 53, 645 F.2d at 919; *Yazel v. United States, supra*, 118 Ct.Cl. at 71–73, 93 F.Supp. at 1003–04.

■ The general rule is that opinion evidence should be evaluated based on the soundness and reality of the reasoning disclosed. *Estate of Mabel Lloyd Ridgely v. United States*, 180 Ct.Cl. 1220, 1232 (1967). *See also Campbell v. United States*, 228 Ct.Cl. 661, 684, 661 F.2d 209, 222 (1981). The Ninth Circuit United States Court of Appeals, in *Holm v. United States*, 325 F.2d 44, 46 (9th Cir.1963), approved a jury instruction which stated in pertinent part: "In this case you have heard the testimony

---

**32.** Hagerty cited several sources of water which contribute to this internal erosion. The primary sources were: (1) flood level waters which charge the bank with water that is allowed to seep out when the flood recedes, (2) ponded or standing water above the banks caused by excessive rainfall, springs and poor drainage, and (3) increased land use including more septic tank runoff and more agricultural use of the land which facilitates the infiltration of water into the soil.

Another erosion mechanism mentioned frequently by Hagerty and other experts is drawdown. Drawdown is somewhat similar to flood-water charged seepage in its effect. Brief-ly, as flood waters rise the water infiltrates tension cracks in the riverbanks. This water creates pressure in the cracks. However, this pressure is counteracted by the pressure on the surface of the riverbanks created by the high-water. As the flood recedes, the countervailing pressure on the face of the bank is removed and the water pressure in the tension cracks acts to cause slumping. Hagerty emphasized drawdown but found it to be a lesser erosion factor since the installation of the high-lift dams because the variation in water level after the recession of flood waters has diminished and thus the drawdown mechanism has less area upon which to act.

of one expert, and I will tell you that you may reject his opinion entirely if you think that the reasons given in support of his opinions are unsound." In this case the court must question the soundness of the conclusions reached by plaintiffs' expert (Fuquay) based on his failure to adequately observe the plaintiffs' properties, the general unrepresentative nature of his chosen study areas, and the fact that he failed to consider the various potential causes of the erosion damage in these cases. (See *supra* note 16.) As the court stated earlier, "opinion evidence is only as good as the facts upon which it is based." *Loesch v. United States, supra,* 227 Ct.Cl. at 46, 645 F.2d at 915. Though the court does not reject the opinion of plaintiffs' expert, the court does attribute less weight to it based on the limited factual basis for his opinion.

■ At the same time that the court attributes less weight to plaintiffs' expert's opinion, the court notes that neither plaintiffs' experts nor plaintiffs' counsel in his post-trial submissions attempted to address the opinion of defendant's experts or the facts which support such opinions. It is true that the testimony of experts is only a guide for the court and not conclusive of the factual issues. *See Estate of Mabel Lloyd Ridgely v. United States, supra,* 180 Ct.Cl. at 1232. However, uncontradicted testimony of an expert can be quite persuasive and thus a party opponent should be prepared to meet and, if possible, discredit an expert's testimony. 11 *J. Moore, Moore's Federal Practice,* § 702.-30[1] (2d ed. 1982).

In this case the opinions of defendant's experts were supported by facts having strong probative value. Though the opinions of defendant's experts conflicted with those of plaintiffs' experts, the court concludes that the direct observations and exhaustive studies of the properties of each plaintiff warrants the court attributing greater weight to the opinions of defendant's experts. 11 *J. Moore, supra,* § 702.-30[3]. The Court of Claims, in *Estate of Mabel Lloyd Ridgely v. United States, supra,* 180 Ct.Cl. at 1232 stated: "It is only where expert opinion is supported by facts having strong probative weight, that the opinion will in itself be given conclusive weight." Though the court does not find the opinions of defendant's experts to be conclusive, it does attribute to them great weight.

■ As noted earlier, plaintiffs, and not defendant, have the burden of proving in these cases, by a preponderance of the evidence, that the construction and operation of the relevant high-lift dams were the direct and proximate cause of the erosion damage incurred on their riparian banks. *See Loesch v. United States, supra,* 227 Ct.Cl. at 44, 53, 645 F.2d at 914; *United States v. 329.05 Acres of Land,* 156 F.Supp. 67, 71 (S.D.N.Y.1957), *aff'd,* 263 F.2d 331 (2d Cir.1959); *United States ex rel. T.V.A. v. 137 Acres of Land,* 406 F.2d 1283, 1287 (6th Cir.1969). These are also cases, as stated previously, in which the complexity of the erosion issue warrants the court placing a great deal of emphasis on expert testimony. *See Loesch v. United States, supra,* 227 Ct.Cl. at 45, 645 F.2d at 914. Upon a review of the entire record, including the testimony of the plaintiff landowners or their representatives,[33] and with specific emphasis on the expert testimony presented by both parties, the court concludes that plaintiffs have failed to carry their burden of proving that the con-

---

**33.** Though the court placed more weight on the opinions of the experts concerning causation than it did on the causation opinions given by the lay plaintiff/landowners, the court recognizes that expert testimony does not foreclose lay testimony concerning the same matter. *See Stafos v. Missouri Pacific Rd. Co.,* 367 F.2d 314, 317 (10th Cir.1966). The court thoroughly reviewed the testimony and opinions of all of the plaintiffs and considered their views on causation. However, given the complex and varied forces involved in ascertaining erosion, many of which are not readily apparent by simply viewing a riverbank, the court places less weight on the opinions proffered by plaintiffs. With both expert and nonexpert opinions before it, it is the court's responsibility to determine how much weight is to be accorded to such opinions. *See Greenwood Ranches, Inc. v. Skie Constr. Co.,* 629 F.2d 518 (8th Cir.1980). *See also* 11 *J. Moore, Moore's Federal Practice,* § 702.30[2] (2d ed. 1982).

struction and operation of the high-lift dams on the Ohio River were responsible for the erosion taking place on their properties.[34] Therefore, their erosion claims must be denied.

### B.

█ In addition to plaintiffs' claim that the construction and operation of the high-lift dams by defendant caused significant erosion on the entire extent of their riverbanks, plaintiffs also assert that the ordinary high-water marks (OHWM) established by the Corps are erroneous and therefore they are entitled to additional just compensation for resulting additional flowage easement takings.[35]

Plaintiffs' assertion that the OHWM determinations were erroneous is based on the theory of their expert (Fuquay). Fuquay theorizes that the new OHWM determinations made by the Corps in anticipa-

tion of the installation of the high-lift dams were too low. Said new OHWM determinations served as the upper limits for the easements the Corps acquired from the various plaintiffs whose property incurred a pool level increase. Fuquay theorized that the new OHWM should have been established at a higher level and thus the Corps should have been required to purchase more land for easement purposes when the high-lift dams were installed.

Fuquay based his theory on his observations of erosion in the form of benching or terracing which was occurring above the normal pool level and which he stated was caused by wave action. He concluded that the location of such benches should have been the point at which the new OHWM was located. Fuquay apparently assumed that the placing of the OHWM at the level of the observed benching would entitle plaintiffs to additional compensation.[36]

**34.** In *Rhoads v. United States*, 6 Cl.Ct. 278 (1984), this court similarly found that *Rhoads* had failed to meet his burden of proof relative to his claim that the construction of a navigation dam at the mouth of a creek on the Arkansas River was responsible for the erosion of his property. The pool of the dam in *Rhoads* raised the elevation of the water on Rhoads' property some 10 to 12 feet. It is clear to the court, contrary to plaintiffs' assertion, that these erosion cases are complex. Such cases require a great deal of persuasive expert testimony along with a clear and concise development of the facts in order for plaintiffs to satisfy the burden of proof requirement imposed upon them.

**35.** This argument concerning the accuracy of the OHWM determinations was raised by plaintiffs in its final brief. It was not an issue that was tried. *See Baskett v. United States*, 2 Cl.Ct. 356 (1983). It appears that the testimony of plaintiffs' primary expert (Fuquay) at trial in which he stated that the OHWM determination should have been established higher up on plaintiffs' riverbanks resurfaced this argument and plaintiffs are pursuing it out of necessity.

The old OHWM, which was established prior to the present OHWM set out to take into account the raising of the pool levels by the high-lift dams, formed the lower limit of the flowage easements acquired from plaintiffs by the Corps. The government's navigational servitude extends to the OHWM. *See United States, v. Willow River Co.*, 324 U.S. 499, 509, 65 S.Ct. 761, 767, 89 L.Ed. 1101 (1945). Established law requires the government only to pay for lands taken above the OHWM. *United States, v. Vir-*

*ginia Electric & Power Co.*, 365 U.S. 624, 627–28, 81 S.Ct. 784, 787–88, 5 L.Ed.2d 838 (1961). In this case the OHWM questioned by Fuquay is the upper limit of the flowage easements obtained by the Corps. The old OHWM, which formed the lower limit of the flowage easements obtained from plaintiff by the Corps, corresponds to the OHWM referred to in *United States v. Virginia Electric & Power Co., supra*.

**36.** Plaintiffs' counsel further complicates the issue concerning the propriety of the OHWM determinations by at least implicitly arguing that the initial OHWM was established at the time of the 1911–14 maps presented at trial. Plaintiffs' counsel implies that the present plaintiffs were entitled to compensation for all of the land taken between this early OHWM and the proper OHWM that Fuquay argues should be established. Plaintiffs' counsel is apparently of the opinion that only one actual OHWM can exist and that was the one established on the 1911–14 map placed into evidence.

Putting Fuquay's theory aside for the moment, the court rejects the view of plaintiffs' counsel that plaintiffs are entitled to compensation for all land taken from the 1911–1914 OHWM to the new proper OHWM as theorized by Fuquay. An OHWM is not a static line established at one point in time. This point is evidenced by the 1911–1914 river maps relied on by plaintiffs, which indicate two distinct OHWMs established approximately 20 years apart. Additionally, another set of OHWMs was established on the river when the low-lift were installed. Presumably, the landowners were

After reviewing Fuquay's theory, the court concludes that plaintiffs have failed to carry their burden of establishing by a preponderance of the evidence that the Corps' OHWM determinations as to each property in issue were erroneous. Such a failure of proof is one basis upon which to reject any claims regarding the propriety of the present OHWM. *See Loesch v. United States, supra,* 227 Ct.Cl. at 59, 645 F.2d at 923; *United States v. 329.05 Acres of Land, supra,* 156 F.Supp. at 71. *See also United States ex rel. T.V.A. v. 137 Acres of Land, supra,* 406 F.2d at 1287.

Fuquay, who spent only one weekend viewing the properties of some of the plaintiffs on the McAlpine and Cannelton pools from a boat, admitted that he had not determined where the OHWMs should be located. The court finds that his OHWM theory was a generalized one with no proof that it held true for all of the properties at issue. Plaintiffs presented no survey evidence or other indicia of the correct locations for the alleged proper OHWMs for the specific sites. In addition, Fuquay's testimony did not indicate that the benches he observed were in fact above the easement areas acquired by the Corps. It may well be that the benches he observed on certain properties were within the easement areas acquired by the Corps from the property owners allowing the Corps to temporarily flood said areas. *See* note 5, *supra.*

Fuquay's testimony concerning the accuracy of the OHWM determinations was given in the context of erosion generally. After he admitted that the actions of the high-lift dams were not responsible for erosion on the upper banks, he focused his attention on the benching close to the land-water interface. Basically, Fuquay stated that the OHWMs (upper limits of the easements) should be raised to account for wave generated erosion on the lower banks not anticipated by the Corps. However, as stated earlier, after reviewing the testimony of the experts of both parties, and the bases therefor, the court is persuaded that the benching and terracing phenomenon observed by Fuquay and some of the plaintiffs were caused not by wave action, but by the mechanism of internal erosion.[37] Internal erosion, also referred to as piping or seeping, caused, in part, the failure of the upper banks. Eventually, the failed material of the upper banks works its way down the bank and accumulates at the lower levels on the riverbanks. This failed debris forms terraces or benches because the continuous piping action constantly moves the lighter soils downward while the denser soils settle on the bank more quickly. The result of this movement of various types of soils is a terraced effect.[38] Therefore, the court is persuaded that the line of benches observed by Fuquay was not caused by the raising of the pool levels and associated wave action and no additional compensation is due plaintiffs as a result of this finding.

### C.

In addition to plaintiffs' wave theory and associated OHWM argument, plaintiffs have advanced a number of other arguments in support of their claim that the high-lift dams caused the erosion on their riverbanks. The court notes that these arguments were often less than clear and frequently based on the testimony of plain-

compensated for the land taken up to the OHWM established when the low-lift dams were installed. If they were not, any claims for such compensation are now barred by the statute of limitations. Therefore, it was not necessary for the Corps to compensate plaintiffs for all of the land between the 1911–1914 OHWM and Fuquay's perceived proper OHWM since the OHWM is constantly changing and was certainly updated when the low-lift dams were placed in operation, and again updated when the high-lift dams were constructed.

**37.** The court notes that very few of the plaintiffs cited as significant the benching-type of erosion observed by Fuquay near the land-water interface. The erosion emphasized by plaintiffs is that which was taking place on their upper banks. It is that type of upper bank erosion damage which Fuquay conceded was not caused by the high-lift dams at issue.

**38.** The testimony of one of plaintiff's experts (Gray) (*see supra* note 14) supports this theory on how the benches were formed (Tr. 5135).

tiffs' counsel to which the court need not attribute any weight. In any event, the court has reviewed plaintiffs' subsidiary arguments and finds none of them persuasive on the issue of erosion.[39]

For example, plaintiffs cite *Cloverport Sand and Gravel Co. v. United States*, 6 Cl.Ct. 178 (1984) as an instance in which the Corps admitted liability for flooding caused by one of the high-lift dams on the Ohio River (Cannelton Dam), suggesting the Corps should have admitted liability in these cases. The Government did admit liability in the *Cloverport* case but that case is factually distinguishable from the case at bar.

In *Cloverport v. United States, supra*, the plaintiff owned a gravel pit which was separated from the Ohio River (Cannelton Pool) by a natural levee. When the pool level was increased behind Cannelton Dam, the water table in plaintiff's pit also rose. However, the Corps, like it did with many of the plaintiffs in these cases, acquired an easement to compensate the plaintiff for such a taking. *Id.* 6 Cl.Ct. at 184. After one major flood in a series of spring floods in 1972, instead of just allowing the pool level to recede to its normal elevation of 383 m.s.l., the Corps allowed it to drop to 373 m.s.l. to allow for the demolition of a low-lift dam. In doing so, the Corps removed the support for the levee separating the plaintiff's pit from the river and the levee collapsed. Without the levee the pit was completely open to the activities of the Ohio River including the accumulation of debris and sediment in the excavation area. It was clear in *Cloverport* that the Corps in dropping the pool below the normal pool level caused the levee to collapse and the pit to become excessively flooded. The ad-

---

**39.** Many of the subsidiary arguments raised by plaintiffs were addressed in detail and rejected by the court in *Loesch v. United States, supra*. For example, in these cases, like in *Loesch*, plaintiffs assert that the Corps was without authority from Congress to construct the high-lift dam navigation system on the Ohio River. However, plaintiffs in these cases as in *Loesch* failed to introduce sufficient evidence to prove this assertion. *See Loesch v. United States, supra*, 227 Ct.Cl. at 39 n. 5, 645 F.2d at 911 n. 5.

Another subsidiary argument on causation, raised primarily by plaintiffs' counsel, is that sediment is accumulating in the center of the Ohio River which is making the river shallower and thus causing it to become increasingly wider. Plaintiffs' counsel asserts that such a widening of the river is resulting in a taking of plaintiffs' property. Based on the entire record, the court does not find that the high-lift dams are causing an excessive amount of sediment to settle in the river channel. The testimony of defendant's experts persuasively supports the court's finding in this regard. Plaintiffs' counsel's argument was essentially based on *post hoc ergo propter hoc* reasoning that the banks are eroding and therefore the sediment must be accumulating in the river. The court finds such an approach to proving sediment accumulation unpersuasive. *See Volentine and Littleton v. United States*, 144 Ct.Cl. 723, 726, 169 F.Supp. 263, 265 (1959). The experiments conducted and data collected by defendant's experts persuade that sediment accumulation in the river has not increased significantly since the installation of the high-lift dams.

Plaintiffs' counsel also asserted at oral argument and in plaintiff's reply brief that the Ohio River had only increased in width 0.001 of an inch to 1.9 inches at the most annually from its inception until the installation of the high-lift dams and since the installation of the dams the banks have been eroding at a much more substantial rate. Plaintiff's counsel argued that these facts clearly demonstrate the high-lift dams are causing plaintiffs' erosion damage.

Plaintiffs calculated the 0.001 of an inch to 1.9 inch annual increase in the width of the Ohio River by dividing its current width (2000 feet) by the age of a given portion of the river (either 1,000,000 or 13,000 years). The record indicates that the assumptions upon which plaintiffs' counsel based this calculation are clearly erroneous. The photographs and movies placed into evidence at trial graphically indicated that substantial erosion has occurred along the Ohio River for many years and probably since its inception. In addition, defendant's expert (Schumm) classified the Ohio River as a meandering river which means that its channel is constantly changing position. The record indicates, contrary to plaintiffs' counsel's assumptions, that the Ohio River has maintained a substantially consistent width for centuries. Its banks have undergone a constant gradual process of eroding and healing which acted to maintain its substantially constant width while the river experienced path alterations. Therefore, plaintiffs' counsel's conclusion regarding the rate of erosion on the Ohio River banks and corresponding width changes prior to the high-lift dams being much less than the rate after the dams became operative has no support in the record.

mission of liability in *Cloverport* was based on the conceded fact that the Corps caused the damage.

█ In this case the Government maintains that its construction and operation of the high-lift dams have not caused the damage complained of and the court concludes that plaintiffs have not proven otherwise. Several of the plaintiffs cited intermittent acts by the Corps as potential causes of erosion on the properties. Such instances include manipulation of the dams to lower pool levels to facilitate the removal of the low-lift dams on the few occasions that this was necessary. The dams were also manipulated in rare emergency situations to provide an influx of water into a downstream pool to float off a grounded barge or to remove debris from the gates of a downstream dam. Such intermittent acts alone do not constitute takings by inverse condemnation. *See Singleton v. United States*, 6 Cl.Ct. 156, 162–63 (1984) and cases cited therein. In addition, absent a showing that such manipulations of the dams caused damage to plaintiff's property no taking can be established. *See generally Cloverport v. United States, supra.* After a review of the record the court finds insufficient evidence in this case to prove that the cited intermittent manipulations of the relevant high-lift dams caused any of the erosion damage on plaintiffs' riverbanks.

The court concludes that, after reviewing all of plaintiffs' theories concerning the high-lift dams' alleged causation of the damage complained of, plaintiffs have not met their burden of proof. Said burden, as stated earlier, was to show by a preponderance of the evidence that the construction and operation of the dams in question were the direct and proximate cause of the erosion damage on plaintiffs' properties. *See Loesch v. United States, supra,* 227 Ct.Cl. at 44, 53, 645 F.2d at 913, 920. Plaintiffs have fallen short of this burden under every theory of causation presented by them.

## III.

█ If one assumes *arguendo* that the high-lift dams at issue do cause the erosion complained of, then it is necessary to address the statute of limitations question. In defendant's post-trial brief it argues that the claims of some of the plaintiffs in these cases should be barred by the statute of limitations. Defendant urges the court to find that plaintiffs' cause of action first accrued when the normal pool level behind each high-lift dam at issue was reached for the first time citing *Court of Marion County v. United States*, 53 Ct.Cl. 120 (1918). However, defendant does recognize that the rule which states that a riparian landowner's cause of action accrues when a dam is completed and its pool is completely filled, has been implicitly rejected in some cases. Defendant urges as an alternative that the court find plaintiffs' cause of action accrued "once the consequences purportedly resulting from the impoundment of the pools became apparent." (Df's Br. 5). *See United States v. Dickinson*, 331 U.S. 745, 749, 67 S.Ct. 1382, 1385, 91 L.Ed. 1789 (1947); *Loesch v. United States, supra,* 227 Ct.Cl. at 61 n. 30, 645 F.2d at 924–25 n. 30; *Barnes v. United States, supra,* 210 Ct.Cl. at 480, 538 F.2d at 873.

Plaintiffs, both anticipating defendant's statute of limitations argument and responding thereto in their post-trial submissions appear to argue that until the easement areas taken by the Corps are completely washed away, the landowners' cause of action does not accrue. Plaintiffs argue that none of the easement areas on the plaintiffs' properties had completely eroded away more than 6 years prior to each plaintiff filing suit. Plaintiffs cite *United States v. Dickinson, supra,* in support of their argument that the "taking" in these cases is continuous and was not completed prior to the filing of their petitions (complaints). Therefore, they conclude the statute of limitations is not a bar to any of their suits.[40]

---

**40.** Plaintiffs stated in their reply to defendant's post-trial brief that the parties reserved the stat-

ute of limitations problems for the damage trial. First, the court has no knowledge that this issue

Plaintiffs had 6 years after their claims first accrued to file their complaints in this court. 28 U.S.C. § 2501 (1982).[41] Therefore, the court must determine when the claims of the respective plaintiffs first accrued in these cases. However, it is first necessary for the court to set forth the appropriate test for determining the proper date upon which a claim accrues in cases like the ones at bar.

Defendant urges the court to adopt the reasoning in *Court of Marion County v. United States, supra.* The Court of Claims stated in that case:

> We are of the opinion that the cause of action, if there was one, * * * accrued when Dam 14 was completed and put in operation by the filling of the pool, and that action not having been commenced within six years, we are without jurisdiction. [*Id.* at 150.]

However, two points weigh against utilizing the date upon which the dam pools were completely elevated as the day that the plaintiffs' cases first accrued in these cases. First, *Court of Marion County v. United States, supra,* involved a claim that certain dams raised the water level and caused continuous overflows making use of a road impossible. Thus, it was a case involving flooding and not specifically the problem of erosion damage. The court opines that in cases in which it is alleged that dams are causing flooding alone, which results in a taking, utilization of the date of complete impoundment may be appropriate. However, in a case such as this one, in which erosion damage is claimed, the erosion may be more gradual and the effects not as readily apparent as would be the case with continuous flooding. Therefore, the court concludes that the factual

distinctions between this case and *Court of Marion County v. United States, supra,* weigh against utilizing the test set forth in that case.

The second point which weighs against using the date the normal pool levels were achieved behind the various high-lift dams as the date plaintiffs' causes of action accrued is the development of case law since *Court of Marion County* was decided some 67 years ago. Specifically the Supreme Court in *United States v. Dickinson, supra,* seemed to reject the test that a cause of action accrued for flood and erosion damage caused by a dam on the date a dam had completely impounded its pool. The ruling in *Dickinson* places a cloud on the vitality of the test set forth in *Court of Marion County v. United States, supra,* 53 Ct.Cl. at 150, at least in cases where a dam impoundment causes erosion.

Apropos to defendant's assertion that plaintiffs' causes of action accrued when the dam became operational, the Supreme Court stated:

> If suit must be brought, lest he jeopardize his rights, as soon as his land is invaded, other contingencies would be running against him—for instance, the uncertainty of the damage and the risk of *res judicata* against recovering later for damage as yet uncertain. The source of the entire claim—the overflow due to rises in the level of the river—is not a single event; it is continuous. And as there is nothing in reason, so there is nothing in legal doctrine, to preclude the law from meeting such a process by postponing suit until the situation becomes stabilized. An owner of land flooded by the Government would not unnaturally postpone bringing a suit against the

was reserved. Second, the fact the defendant presented a thorough argument on the statute of limitations in its post-trial brief does not indicate that defendant reserved the issue. Finally, the statute of limitations is jurisdictional. *Parker v. United States,* 2 Cl.Ct. 399, 402 (1983) and cases cited therein. Therefore, such an issue could not be reserved by the parties.

**41.** In this case plaintiffs in Docket No. 161–78 must show that their claims accrued on or after

April 14, 1972. Plaintiffs in Docket No. 340–78 must demonstrate that their claims accrued on or after July 25, 1972. Plaintiffs in Docket No. 311–80L must establish that their claims accrued on or after June 17, 1974. The actions of plaintiffs in Docket No. 317–79L must have accrued on or after July 16, 1973. Finally, plaintiffs in Docket No. 616–80L must show that their cases accrued on or after November 17, 1974.

Government for the flooding until the consequences of inundation have so manifested themselves that a final account may be struck. [331 U.S. at 749.]

Though the court agrees that this language in *Dickinson* makes the viability of the test set out in *Court of Marion County v. United States, supra*, questionable, the court does not agree that *Dickinson* necessarily requires that the riverbanks at issue in these cases be entirely washed away before a cause of action accrues, as plaintiffs maintain in these cases.

The court believes that the approach followed in *Nadler Foundry and Machine Co. v. United States*, 143 Ct.Cl. 92, 164 F.Supp. 249 (1958) is proper in this case. The court in *Nadler* in discussing when the statute of limitations begins to run focused on the following portion of the above-quoted language from *Dickinson v. United States:* "until the consequences of inundation have so manifested themselves that a final account may be struck." *Nadler Foundry and Machine Co. v. United States, supra*, 143 Ct.Cl. at 95, 164 F.Supp. at 251 (quoting *Dickinson v. United States, supra*, 331 U.S. at 749, 67 S.Ct. at 1385). The *Nadler* court pointed out that "the *Dickinson* doctrine does not permit a plaintiff to wait 'until any possibility of further damage (has) been removed.'" 143 Ct.Cl. at 95, 164 F.Supp. at 251 (quoting in part *Columbia Basin Orchard v. United States*, 116 Ct.Cl. 348, 357, 88 F.Supp. 738, 739 (1950)). The court in *Nadler Foundry and Machine Co. v. United States, supra*, 143 Ct.Cl. at 95–96, 164 F.Supp. at 251, focused on the foreseeability of damage resulting from the defendant's activities. The court concludes based on the above case law that the proper test for determining when the statute of limitations began to run in these cases is when the damage (1) manifested itself so that it should have been recognized, (2) the circumstances were such that the damage was a foreseea-

ble future event, or (3) that the alleged effects of the dams' actions were fully known by the landowners. For additional support for this test see *Lacey v. United States*, 219 Ct.Cl. 551, 559–61, 595 F.2d 614, 618 (1979); *Barnes v. United States, supra*, 210 Ct.Cl. at 480, 538 F.2d at 873; *North Counties Hydro-Electric Co. v. United States*, 138 Ct.Cl. 380, 384, 151 F.Supp. 322, *cert. denied*, 355 U.S. 882, 78 S.Ct. 149, 2 L.Ed.2d 112 (1957).

Applying the above test to the litigants in this case it is necessary to survey the litigants by pools. However, after reviewing the record, the court finds it possible to make one generalization. Many of the plaintiffs, or representatives who testified on their behalf, indicated that they became aware of erosion on their riverbanks shortly after the high-lift dams, which created the pools adjacent to their property, were installed. In any event, even if actual knowledge of erosion was not asserted by the plaintiffs, often the mere passage of time is sufficient to presume that some of the erosion damage complained of would have manifested itself.

For example, the Meldahl pool reached its normal level by March of 1965. The earliest petition filed by a plaintiff who owned property in the Meldahl pool was filed on July 25, 1978. Based on these facts, it is necessary to assume that no erosion damage manifested itself on these properties so that the plaintiffs should have recognized it until July 25, 1972, in order to find that plaintiffs filed their petitions in a timely manner. Based on the entire record the court finds that erosion damage as alleged by plaintiffs to have been caused by the high-lift dams would have manifested itself, if at all, before July 25, 1972, and therefore, it appears that the claims of the plaintiffs who owned land on the Meldahl pool are barred by the statute of limitations.[42]

---

**42.** Plaintiffs' expert, Fuquay, testified that the benching or terracing he observed and claimed were caused by the combination of the pool level increases and wave action would manifest themselves in 2 to 5 years. Even using the outside estimate of 5 years, according to Fuquay, the benches he alleged were caused by the high-lift dams should have been apparent on the riverbanks. Fuquay theorized that these benching lines represented the proper ordinary high-

The Markland Dam pool achieved its normal pool elevation in January of 1963. The earliest complaint filed by a landowner on said pool alleging a taking caused by erosion was filed on July 25, 1978. That complaint was filed over 15 years after the normal pool level was attained. Again, based on the entire record the court finds that the alleged erosion caused by the Markland Dam would have manifested itself, by at least July 25, 1972 (over 9 years later) (*see supra* note 42). Plaintiffs should have been aware of erosion damage by that time or at least it should have been a foreseeable event. *See Nadler Foundry and Machine Co. v. United States, supra*, 143 Ct.Cl. at 95–96, 164 F.Supp. at 251. Therefore, the court is of the view that the claims of the Markland pool plaintiffs are barred by the statute of limitations.

The McAlpine Dam pool like some of the portions of the other pools at issue presents an interesting situation. The McAlpine Dam was completed in 1965, but it did not alter the pool level previously established by old Dam 41 in 1927. Therefore, based solely on pool level variations it would appear that if any erosion was going to occur due to either old Dam 41 or the McAlpine Dam holding the pool level at 420 feet m.s.l. it would have done so between 1927 and April 14, 1972 (6 years prior to the earliest petition filed by a landowner on the McAlpine pool).

However, if the court assumes that the plaintiffs, who own property adjacent to the McAlpine pool, attribute the erosion damage on their property to the manipulation of the upstream Markland dam then it is necessary to again consider the operation of the Markland Dam. The Markland Dam, as stated above, became completely operational in January of 1963. If its operation were going to cause erosion on the riverbanks on the McAlpine pool, the record indicates that it would have manifested itself before April 14, 1972 (*see supra* note 42). Therefore, the court is of the view that the claims of the plaintiffs in the McAlpine pool were not timely filed.

When the court examines the claims of the plaintiffs in the Cannelton and Newburgh pools the issue concerning the statute of limitations is less clear. The pool levels in the Cannelton and Newburgh pools reached their normal elevations in August of 1972 and January of 1975, respectively. Therefore, for the most part these pools were established at a time that if any erosion damage was caused by these dams it probably would have manifested itself at a time, such that all of the plaintiffs within those pools, with the exception of eight to be discussed below, could be deemed to have filed their complaints within the statute of limitations time period.[43]

As the court mentioned previously, eight of the plaintiffs in these cases own property within the Cannelton pool where the pool of old Dam 43 used to be located. (Mackey and Mary Jane Knear, Ed and Lillian

---

water mark. An OHWM is a physical fact on a riverbank which can be determined by inspection. *See Loesch v. United States, supra*, 227 Ct.Cl. at 34, 61, 645 F.2d at 905, 925; *Kelley's Creek & N.W. R.R. Co. v. United States*, 100 Ct.Cl. 396, 405–06 (1943). If Fuquay's position is that such an OHWM should have formed in, at most, 5 years and OHWMs are observable physical facts then some plaintiffs should have been aware of some of the erosion damage at a time which would be more than 6 years prior to the filing of the earliest complaint in these cases. Supportive of this approach is the testimony of Charles Leedy (10), a plaintiff in Docket No. 317–79L, who noticed erosion taking place on his property in 1969 or 1970 (Tr. 3751). Leedy's property was utilized extensively by plaintiff's counsel to illustrate his OHWM position during oral argument. Also Elmer Lee

Jones (24), a plaintiff in Docket No. 340–78, testified he first noticed erosion on his property in the winter of 1965 (Tr. 7097).

**43.** It may be the case that individual plaintiffs expressed that they had knowledge of erosion on their property, which would commence the running of the statute of limitations period to expire prior to the filing of their petition. However, defendant's approach in developing its statute of limitations argument was generalized. Plaintiffs were not questioned specifically to determine when they first became aware of damage on their property. Therefore, the court does not find the evidence developed enough to dismiss any additional claims on the Cannelton and Newburgh pools except those discussed *infra*.

Knear, Howard B. Marrs (*see supra* note 6), City of West Point, Kentucky, Harold and Julie Cunningham, Ben Reid, Sr. (*see supra* note 6), Benjamin and Helen Perchik, and Ben Reid). In that area there was no pool level increase nor had there been one since 1929. Clearly, if the pool level itself was going to cause erosion it would have manifested such damage prior to April 14, 1972 (6 years prior to the earliest complaint filing). However, if these plaintiffs are claiming that their alleged erosion was caused by the operation of the upstream McAlpine Dam, then it is necessary to review the history of said dam. The McAlpine Dam was completed in 1965. Its predecessor, old Dam 41, was completed in 1927. Both the old and new dams functioned in a similar manner. Thus it appears that the operation of the McAlpine Dam and previous old Dam 41 would have been affecting the properties of the above eight plaintiffs for a sufficiently long period to manifest erosion, if at all, prior to April 14, 1972 (6 years prior to the filing of the earliest complaint). Even if the court focuses solely on the operation of the McAlpine Dam, it would appear from the record that the manipulation of that dam would have resulted in a manifestation of erosion or made it a foreseeable result prior to the April 14, 1972, since it commenced operations in 1965 (*see supra* note 42). Therefore, the claims of the above-cited eight plaintiffs on the Cannelton pool are barred by the statute of limitations.

It is at least arguable that the claims of the three plaintiffs with property on the Newburgh pool are barred by the statute of limitations. The Newburgh Dam was completed in October of 1975. However, all three of the plaintiffs with property on the Newburgh pool owned land in the area where the pool impounded by old Dam 46 previously existed. Old Dam 46 was completed in 1929. The Newburgh pool did not alter the pool elevation in the area of the pool created by Old Dam 46. Therefore, based only on pool level variations· it would appear that if any erosion was going to occur due to either old Dam 46 or the Newburgh Dam holding the pool level (358 feet m.s.l.) at the same level it would have manifested itself long before July 25, 1972 (6 years prior to the earliest petition filed by a landowner on the Newburgh pool).

However, if the court assumes that the plaintiffs, who own property adjacent to the Newburgh pool, attribute the erosion damage on their property to the manipulation of the upstream Cannelton Dam, then their claims are clearly not time barred. Cannelton Dam was not completed until 1974 though its impounded pool reached its permanent level in August of 1972. Utilizing either date, the Cannelton Dam was completed within 6 years of the date the plaintiffs on the Newburgh pool filed their complaints and thus, assuming that they assert that the Cannelton Dam caused their erosion dam, the statute of limitations does not bar their claims.

Based on the above discussion, the court concludes that if it had found that the high-lift dams were the direct and proximate cause of some or all of the erosion damage complained of, which it did not, the statute of limitations would appear to bar the claims of many of the plaintiffs.

III.

Based upon the facts as found and discussed and the conclusions of law reached relative thereto, as set forth in this opinion, the court concludes that plaintiffs are not entitled to recover in these consolidated cases, with the result that their petitions (complaints), five in number, are to be dismissed.